Patricia Ann MEAD, Appellant,

v.

CORBIN EQUIPMENT, INC., Dempster Brothers, Inc., Carrier Corporation, d/b/a Carrier Air Conditioning Company, Respondents,

and

Carnation Company, Pet Milk Division, Respondent.

No. 30100.

Missouri Court of Appeals, Western District.

July 31, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 4, 1979.

Application to Transfer Denied Oct. 10, 1979.

Richard A. Erickson, William B. Morgan and David H. Dunlap, Kansas City, for appellant.

William R. Fish, Kansas City, for Corbin Equipment, Inc.

Reed O. Gentry, Kansas City, for Dempster Bros., Inc., Carrier Corp. d/b/a Carrier Air Conditioning Co.

Neal E. Millert and Larry J. Tyrl, Kansas City, for Carnation Company.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

MANFORD, Judge.

This is an action for wrongful death brought by a surviving spouse. Upon trial, the court directed a verdict for respondents on Count II of the petition, and the jury entered verdict for respondents on Count I of the petition. Appeal is upon both verdict entries. Affirmed.

A brief recital of the facts is necessary to effect disposition of this matter.

The deceased, Donald Mead, was an employee of Continental Steel and Conveyor Co., an independent contracting firm which had been retained by respondent Carnation Company to do certain work upon a trash compacting machine.

At this juncture, the parties should be identified. The Carnation Company was the owner of the trash compactor and it was at or upon its plant site that Donald Mead met his demise.

Dempster Brothers, Inc. was the manufacturer of the trash compactor and at the time of decedent's death, it was a wholly owned subsidiary of Carrier Corporation. It no longer is an individual corporation because on October 31, 1973, it became known as Dempster Brothers, Inc., Division of Carrier Corporation. This identifies Carrier Corporation d/b/a Carrier Air Conditioning Company, also joined herein. For purposes herein, these two respondents are identified simply as Carrier.

Corbin Equipment, Inc. is the distributor for Carrier. (Corbin Equipment, Inc. is hereinafter referred to as Corbin.) The trash compactor was sold by Corbin for Carrier to Wheeling and Company. Wheeling and Company was the installing and servicing company for the compactor, and although originally joined as a defendant, appellant dismissed as against Wheeling.

Appellant's amended petition was in two counts. Count I was upon the theory of strict liability. Count II was upon the theory of negligence. Both counts were against all defendants.

Prior to trial, respondent Carnation Company filed a motion to strike Count I of the petition as to Carnation Company pursuant to Rule 55.27(e). This motion was sustained by the trial court. At commencement of trial, Count II stood as against all respondents, and Count I stood as against all respondents, except Carnation Company.

The decedent, Donald Mead, was crushed to death by a trash compactor. This trash compactor was of a commercial type identified as SP42–50. Donald Mead was the job site foreman for Continental Steel and Conveyer Company which had contracted with Carnation Company on a variety of jobs. These jobs included installing a steel platform frame so at a later time, forklift trucks could exit the Carnation Company plant onto the platform and move onto a dockboard covering the compactor.

The compactor is a relatively large piece of machinery. It extends some 15 feet north of the Carnation Company plant, is 98 inches wide and is some 62 inches above ground. The compactor internally contains a "ramhead", which by hydraulic power, slides along channels on each internal side of the compactor. The stroke of the ramhead or packerhead covers some 78–80 inches in a north-south direction. The trash is moved into the receptacle part of the unit with 50,800 pounds of pressure or force. A complete cycle of the ramhead or packerhead is approximately 100 seconds. The forward stroke requires some 60 seconds with the backward or return stroke encompassing some 40 seconds.

The work adjacent to and upon the compactor by Mead and his two co-workers had commenced and continued off and on for some three to four months prior to the fatality. The co-workers were identified as Maurice Suesens and Curtis Earlywine, both of whom were upon the scene at the time of the fatality.

On the date in question, employee Suesens was performing a welding chore. He was on a metal platform above and to the east of the compactor. His position placed him next to the dockboard of the compactor. This dockboard is a flat-surfaced area of heavy meshed wire, sturdy enough to walk upon. By virtue of its "mesh" character, one can see through it into the top of the compactor in the precise area where the ramhead moves back and forth through its compacting cycle.

At this moment, the decedent and co-worker Earlywine were working alongside the compactor. Both were on the ground along the northeast side, trying to fit a piece of checkerplate into position for welding.

It should be pointed out that this compactor, when sold and delivered, did not include a dockboard as referred to above, or any supporting framework therefor. It was such items, along with other additions and modifications to the compactor, that the decedent and his co-workers were engaged in or working on at the time of this fatality.

Prior to the particular day and upon the day of this fatal accident, the compactor was in continued use and the decedent and his co-workers performed their tasks with the compactor running. As Suesens was performing his particular welding task, sparks from the welding operation ignited trash and debris which had collected in the area on top of the compactor beneath the dockboard. Suesens observed a fire and advised the decedent.

When the decedent realized there was a fire, he and Earlywine removed a portion of the checkerplate, permitting them to move toward the south end of the compactor where the fire was located. When Suesens first noticed the fire, the ramhead was fully retracted or toward the south end of its stroke. When decedent and Earlywine moved toward the fire, the ramhead was moving north. Decedent and Earlywine crawled back (south) toward the fire to a point about four feet from the rear or south end of the compactor. This location included a vertical support pipe for the dockboard

which had been installed. At this moment, the ramhead was continuing in a north direction, and it passed within inches of decedent's nose. As it passed, decedent and Earlywine brushed off burning debris from the ramhead. Earlywine departed that precise location to get a fire extinguisher and decedent remained. As Earlywine departed, decedent inserted the upper portion of his body into the area of the moving ramhead. At this point in time, the ramhead was still moving with or in a compacting stroke. Decedent was attempting to move the fire and debris out of the machine. Earlywine, in going for a fire extinguisher, reached the same general area of his co-worker Suesens. At this point, the ramhead was in a retracting stroke, moving south. Both Suesens and Earlywine hollered to decedent to clear himself. Suesens testified he yelled for decedent to get out of there. Suesens further testified decedent made no response to his warning.

Earlywine testified he yelled at decedent, "Get out of there, Don. I'm getting a fire extinguisher," or "Watch that God damn thing, Don, watch that ram." Earlywine further testified, "I seen him (meaning decedent) turn his head like this and look back." The looking back, as the evidence establishes, was toward the north or toward the ram.

The decedent did not remove himself, and the ram continued its retracting stroke. The time lapse from the warnings of Suesens and Earlywine until decedent was crushed was 10–12 seconds. As decedent was removed, it was discovered the ramhead had caught the small of his back and crushed that portion of his body against the third vertical (third from the south end of the compactor) support pipe and the ramhead, and his skull had been crushed between the ramhead and the second vertical support pipe.

Upon trial, at the close of appellant's evidence, the trial court sustained respondents' motions for directed verdict on Count II of the petition, which rested upon the theory of negligence. Count I, the strict liability theory, was submitted to the jury

without any evidence from respondents Corbin, Dempster Brothers, Inc. and Carrier.

The jury returned its verdict in favor of respondents. Motion for new trial was filed and overruled.

Appellant raises three points, alleging error by the trial court in the giving of a converse instruction (no. 7 on behalf of respondent Dempster) on the premise that said instruction required a finding that decedent was "using" the compactor and was contrary to appellant's theory on strict liability that decedent was a bystander and not a user; and that instruction no. 6 hypothesized that respondent Carnation Company was using the compactor in a manner reasonably anticipated, depriving appellant of her theory of the case. In addition, appellant contends the same error in regard to the converse instruction no. 4, on behalf of respondent Corbin and that it was contrary to appellant's theory of strict liability; and instruction no. 3 hypothesized reasonable use of the compactor by Carnation Company.

The third error alleged was the trial court's direction of a verdict for all respondents as to Count II (negligence) on the premise that decedent was guilty of contributory negligence as a matter of law.

For purposes of disposition herein, points I and II are taken up together.

Instruction no. 7 and instruction no. 3 are set forth herein.

### "INSTRUCTION NO. 7

Your verdict must be for defendants Dempster Brothers, Inc. and Carrier Corporation unless you believe:

First, that Donald Mead was *using* the compactor at the time of his death, and

Second, Donald Mead was *using* the compactor in a manner reasonably anticipated, and

Third, the compactor was in substantially the same condition at the time of the death of Donald Mead as it was when delivered to the Carnation Company, and

Fourth, Donald Mead was killed as a direct result of a defect in the compactor which was present at the time it was delivered to the Carnation Company." (Converse-Dempster Brothers, Inc.—Carrier)

### "INSTRUCTION NO. 3

Your verdict must be for Plaintiff Patricia Ann Mead and against Defendant Corbin if you believe:

First, Plaintiff was the lawfully wedded wife and is the surviving widow of Donald Dean Mead, and

Second, Defendant Corbin sold the trash compactor, and

Third, the trash compactor, as manufactured, was defective and therefore dangerous when put to a use reasonably anticipated, and

Fourth, when Carnation bought the trash compactor, it was in substantially the same condition as when manufactured, and

Fifth, Carnation used the trash compactor in a manner reasonably anticipated and Donald Dean Mead was killed as a direct result of the trash compactor being defective, unless you believe that Plaintiff is not entitled to recover by reason of Instruction No. 5." (Verdict director-appellant)

On this appeal, the parties embark upon the controversy of whether decedent was a "user" or a "bystander". This issue, as joined, is not permitted herein to address the question if both users and bystanders are afforded a right of redress in cases of strict liability. To be sure, that question was answered in *Giberson v. Ford Motor Company*, 504 S.W.2d 8 (Mo.1974) wherein the Supreme Court enlarged the group protected to include bystanders.

The matter which must be resolved herein is, "Under which definition do the facts in evidence place the decedent?"

A bystander, as defined by Webster's New Collegiate Dictionary, is "one present but not taking part in a situation or event: a chance spectator." A user, by the same source, is "one that uses" and the verb "use" means to "1. accustom, habituate. 2.

to put into action or service: avail oneself of: employ. 3. to consume or take (as liquor or drugs) regularly. 4. to carry out a purpose or action by means of: utilize. 5. to expend or consume by putting to use. 6. to behave toward: act with regard to: treat . . . "[1]

■ The evidence herein clearly places the decedent, by his actions, within the definition of a user and not a bystander. The evidence established that for some 3–4 months, decedent had off and on been working on and around the trash compactor with a purposeful intent of adding to and modifying the structure thereof. The decedent did not merely report to the particular job site and stand idly by, but with deliberate design, actively engaged in work, attending to the operation and use of the compactor. The decedent, by his activities, was a user within the definition of that term as decided in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo. 1969), and by virtue of that definition, as applied to the facts herein, the issue of decedent being a user was established by the evidence. Therefore, the evidence having established decedent as a user, such was a part of appellant's case and should have been included within appellant's verdict directing instructions. It then must follow that respondents were entitled to converse those instructions. The failure to include the term within the verdict directing instruction did not require respondents to converse an instruction which failed to include an essential element of appellant's case, but to the contrary, the giving of instructions no. 7 and no. 4 were proper as being in conformity with MAI 25.04, MAI 33.01 and Supreme Court Rule 70.02. Points I and II are, for the reasons set forth, ruled against appellant.

■ Appellant's final point alleges error by the trial court in directing a verdict for all respondents upon Count II (negligence theory) of the petition on the basis that decedent was contributorily negligent as a matter of law.

Appellant must fail on point III because the evidence clearly, as a matter of law, established the respondents herein owed no duty or responsibility to appellant which they breached to safeguard the decedent against injury.

In addition, the evidence established the operation of the trash compactor was open and obvious for anyone to see. The decedent had worked around and upon the compactor for some 3–4 months prior to his death. At the time of his death, decedent, owing no duty or responsibility to anyone, knowingly and deliberately inserted the uppermost portion of his body into the compactor. The evidence is unmistakenly clear that the continuation of that body posture, while the compactor was in operation, also provided an obvious appreciation of the danger of serious or fatal injury. The trial court, based upon the evidence, was entirely correct in concluding decedent was contributorily negligent as a matter of law.

The court would be remiss if it failed to note that, as reflected within the record of this case, the briefs and the oral argument, both parties to this litigation were represented by able and dedicated counsel. Their zeal and preparedness are clearly reflected herein.

As mankind continues his day to day working relationship with machines, the misfortune, such as is reflected by the death of appellant's spouse, will perhaps continue to occur. The law finds itself ill-equipped with possible prevention of such misfortune and is left with the charge to determine if and wherein legal responsibility lies and to provide redress for failure to meet that responsibility. As to the case herein, as supported by the evidence, the judgment entered by both the trial court and jury correctly reflect that no failure of responsi-

---

**1.** " 'User' includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased." Restatement of Torts, § 402A, p. 354 (2d ed. 1965).

bility manifested itself. For the reasons set forth herein, the judgment in all respects is affirmed.

All concur.