James F. JARRELL and Annis Gayle
Jarrell, Plaintiffs-Respondents,

v.

FORT WORTH STEEL & MANUFAC-
TURING CO., Defendant-Appellant.

No. 44067.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 24, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
March 8, 1984.

Fritz G. Faerber, Lucas & Murphy, P.C., St. Louis, for defendant-appellant.

James P. Holloran, St. Louis, for plaintiffs-respondents.

KELLY, Judge.

James and Annis Gayle Jarrell, husband and wife, instituted this action for money damages against Fort Worth Steel and Machinery Company and R.J. McCullough, in the Circuit Court of the City of St. Louis to recover for injuries sustained by Mr. Jarrell when his right arm was caught in an ice conveyor manufactured by Fort Worth, purchased by his employer, Swift & Company, and installed in the latter's poultry processing plant at Dexter, Missouri. Judgment was entered on a jury verdict of $1,500,000.00 in favor of Mr. Jarrell and

$100,000.00 in favor of Mrs. Jarrell for her loss of consortium. Fort Worth filed a timely notice of appeal.[1]

The plaintiffs based their cause of action against Fort Worth (hereinafter "Fort Worth" or "defendant") on a strict liability theory in tort for a defective product, and the cause was submitted to the jury on the strict liability theory. MAI 25.04.

## THE ICE CONVEYOR SYSTEM

The conveyor system in this case was manufactured by Fort Worth in 1968, sold to Swift & Company and installed in its poultry processing plant in Dexter, Missouri. This ice conveyor carried ice from the ice crusher machine in Swift's poultry plant to various work stations throughout the plant. These work stations were located in several different rooms in the plant. The ice was accessible through overhead discharge points.

The conveyor's auger screw was encased in a galvanized housing. It was powered by a ten-horsepower electrical motor mounted on the top of the assembly. The screw itself consisted of a nine-inch diameter spiral flighting welded into a two-inch diameter hollow shaft. This screw apparatus was attached to a drive shaft by means of two bolts often described at trial as shear pins. Plaintiff, who was chief of maintenance at the Swift plant in Dexter, testified that when the ice conveyor broke down it was frequently a result of the conveyor pins shearing. There was testimony that these shear pins were designed to be the weakest point in the system so that in the event of an overload the pins would shear before the motor burned out or the gear box stripped.

The conveyor system had two 8″ × 10″ access doors, one at the top of the vertical unit and the other at the bottom. The bottom access door, approximately 20 inches off the floor, was referred to as an "inspection" door or clean-out door in case the unit became jammed.

The electricity for the ice conveyor's ten-horsepower engine could be shut off and padlocked out at the main power disconnect switch in the engine room of the plant. In addition, three start-stop switches located along a horizontal section of the ice conveyor controlled its operation. Once the main power disconnect switch was in the "off" position, none of the start-stop buttons could activate the conveyor. To start the ice conveyor after it had been shut off at the main switch, it was necessary to turn on the main power disconnect switch by moving the lever to the "up" or "on" position *and* to push "on" any one of the three start-stop switches (one of which was located near the accident site). Even if the main power disconnect switch was not shut off, if one depressed one of these start-stop switches, and held the button in the depressed or stopped position, one could not start the system from either of the two remaining switches. The plaintiff testified that when a stop button was depressed, this would lock out the machine's circuit so no electricity could pass through the system. Because the conveyor system carried ice through several rooms of the Dexter plant, a person in one room working along the conveyor could not see a person in another room working near the same conveyor because vision was obstructed by intervening walls.

The ice conveyor assembly when delivered to Swift was accompanied by instructions and was match-marked at defendant's factory to aid the assembly process. Testimony was that if the conveyor as sold was put together following these instructions, the only thing remaining to be done to operate the equipment was to hook up a ten-horsepower engine to the system. By custom in the screw conveyor industry, manufacturers do not provide electrical components with their conveyor packages.

The Swift Company hired an independent electrician to install the motor, controls, and electrical wiring on the ice conveyor. Evidence at trial revealed that this indepen-

1. Defendant R.J. McCullough's Motion for a Directed Verdict at the close of the Evidence was sustained. No appeal was taken from this order.

dent electrician chose the particular wiring and start-stop switches used, and that he received no advice from defendant Fort Worth as to any of the electrical hookups required nor recommendations for switches or interlocks to be used at the access doors. Wiring and bolts excluded, all mechanical components and drive units of the conveyor were manufactured by the defendant. There was testimony that at the time of the accident the system was in the same condition as when originally assembled, and that it had been put together in compliance with the drawings and instructions from the defendant.

## THE ACCIDENT

On July 16, 1975, Mr. Jarrell was head of maintenance at Swift's Dexter plant. He was 36 years of age and an experienced machinist. Late that morning he received a call that the ice conveyor had broken down. He had serviced this ice conveyor over a period of two years while he worked for Swift. At this time he was preparing to transfer from the Dexter plant to a Swift plant in Georgia, and on this particular morning was accompanied by R.J. McCullough, the second defendant, who was to be his replacement in the Dexter maintenance department.

Both men went through the plant engine room where the main power switch for the ice conveyor was located and shut it off. The maintenance policy at the Dexter plant was that prior to servicing any electrically powered machinery, Swift personnel were to "lock out" the power to the machinery by throwing the main power disconnect lever to the down or "off" position, and to secure the lever in this position with a padlock.

Although Mr. Jarrell had been supplied a padlock for this purpose, on this occasion he failed to use the padlock because when he threw the main power switch he learned his padlock was not on his tool belt.

On occasion the Swift maintenance men, if they did not have their padlocks with them, would place a tag on the switch reading "do not touch," after shutting off the power to the ice conveyor at the main disconnect. Mr. Jarrell did not on this occasion put such a tag on the switch. His reason for not doing so was that he did not "trust" their use. He testified that he believed the only safe procedures were to padlock out the power at the main switch or to lock out the current at one of the remote start-stop switches; and that from past experience he knew that if the main power switch was not padlocked out, someone might turn on the main power disconnect after someone else had pulled the switch off and had tagged the switch with a "do not touch" tag.

After leaving the engine room, both men went to the vertical section of the ice conveyor where Mr. Jarrell assumed the cause of the breakdown might be. Prior to commencing work on the conveyor, Mr. Jarrell pushed in the start switch to see if the main power was still shut off. Satisfied that it was, Mr. Jarrell pushed the stop button, removed the horizontal cover and examined the shear pins. After determining that the shear pins at that location were "all right," he proceeded to inspect the shear pins in the conveyor's vertical section. According to Mr. Jarrell, these shear pins were higher than the lower access door, and to ascertain whether they were damaged it was necessary for maintenance personnel to place their arm inside the auger housing at this point and "feel" if the shear pins were damaged.

Before he placed his arm in the conveyor, Mr. Jarrell explained to Mr. McCullough what he was about to do and instructed him to depress the stop button on the remote switch to lock out the power, so that it would not be possible to activate the machine.

As Mr. Jarrell was on his knees, facing away from Mr. McCullough, he could not actually see Mr. McCullough depress the stop button. He did, however, ask Mr. McCullough to lock out the switch and Mr. McCullough responded in the affirmative. Mr. Jarrell placed his right arm through the access door and while reaching upwards to examine the shear pins the ice

conveyor was activated by someone. As a result, Mr. Jarrell lost his right arm.

At the time Mr. Jarrell sustained his injuries he was earning approximately $18,000.00 per year. His evidence was that his loss of wages came to $101,578.00 at time of trial. Expert testimony placed the present value of his loss of future wages between $326,483.00 and $687,343.00.

From the evidence, the jury could reasonably have found that the inspection door on the conveyor at the accident site was so located that a maintenance man could not see the lower shear pins without exposing himself to danger. The jury was required to find that the manufacturer should have reasonably anticipated that maintenance people, such as Mr. Jarrell, would insert their arms through the access door to service the conveyor. The thrust of the Jarrells' case was that a designer of a system of this kind—an ice conveyor—has the duty to take into account certain features essential to the safe operation of the conveyor, regardless of who supplies or installs the electrical hardware. It is clear that the jury was of the same opinion.

On appeal, Fort Worth, presents seven Points Relied On as grounds for reversal. Finding no error, we affirm.

Fort Worth initially contends the trial court erred in refusing to grant its Motion for a Directed Verdict because, as a matter of law, Mr. Jarrell was guilty of contributory fault.

■ In adopting § 402A of the Restatement (Second) of Torts, Missouri has recognized that contributory fault may be interposed as an affirmative defense in actions brought on strict liability. *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 365 [4–6] (Mo.1969). To establish contributory fault as a defense a defendant must prove (1) that the plaintiff knew the facts which create the danger; (2) that the plaintiff comprehends and appreciates the danger; and (3) that plaintiff nevertheless voluntarily and unreasonably exposes himself to the risk. Restatement (Second) of Torts, § 402A, Comment n;

*Mead v. Corbin Equipment, Inc.*, 586 S.W.2d 388, 392[3] (Mo.App.1979); *Kayser v. Rockwell Graphic Systems, Inc.*, 666 F.2d 1233, 1235 [1, 2] (8th Cir.1983); 72 C.J.S. Supplement, Products Liability § 95 (1975).

■ Policy considerations supporting the application of § 402A strict liability to design error situations are compelling. The doctrine is based on public policy that the costs of injuries from defective products are to be borne as a cost of business by the manufacturer who placed the product in the stream of commerce and not by the injured parties who are unable to protect themselves. *Keener v. Dayton Electric Manufacturing Company, supra*, l.c. 364, quoting *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901[4] (1963).

■ The Kayser opinion indicates that Fort Worth Steel, as appellant, carries an onerous burden in its attempt to overturn the jury verdict for the Jarrells. A directed verdict is a drastic action and should be granted only where no reasonable and honest men could differ on a correct disposition of the case. *Martin v. Brume*, 631 S.W.2d 77, 79[1] (Mo.App.1982). Fort Worth is not entitled to a directed verdict unless reasonable minds, viewing the evidence in a light most favorable to the Jarrells, could only have found in Fort Worth's favor.

■ Contributory fault is ordinarily a jury issue. Viewing the overall record of this case, and in view of the standard of review mandated above, we cannot conclude that Mr. Jarrell was, as a matter of law, guilty of contributory fault. See *Higgins v. Paul Hardeman, Inc.*, 457 S.W.2d 943, 947[2] (Mo.App.1979); *Kennedy v. Custom Ice Equipment Co., Inc.*, 271 S.C. 171, 246 S.E.2d 176, 178[2, 3] (1978).

■ Fort Worth contends that its Motion for Directed Verdict should have been granted because Mr. Jarrell's testimony proves the defense of contributory fault because it reveals that he voluntarily exposed himself to a known risk and hazard.

In support of this contention appellant argues that Mr. Jarrell was an experienced maintenance man fully aware of the nature of the ice conveyor, based upon two years experience in maintaining, servicing and repairing the very machine that injured him; that he was the chief of maintenance at the plant and knew that he was subjecting himself to injury by placing his arm in the conveyor without locking the power out; and he also knew that if the power was not locked out the conveyor could be activated from a remote location if Mr. McCullough were inattentive or failed to depress the stop button.

Mr. Jarrell testified that having someone keep the start-stop switch depressed would lock out the circuitry of the machine and "do the same thing" as padlocking the main disconnect. Whether Mr. Jarrell was justified in placing his trust in Mr. McCullough was properly a jury question.

Had the stop button been depressed and held in that position, the conveyor was locked out and could not have been started. Under these facts, Mr. Jarrell, at the time he placed his arm through the access door, was satisfied that the electricity had been locked out, the electrical circuit disconnected, and there was no danger. Fort Worth's evidence does not demonstrate that Mr. Jarrell appreciated the danger of the situation or, under the circumstances, acted unreasonably—the second and third elements essential to a successful contributory fault defense. Keener, supra, l.c. 365; *Higgins v. Paul Hardeman,* supra.

We hold that the trial court did not err in refusing to grant Fort Worth's Motion for Directed Verdict because as a matter of law Mr. Jarrell was guilty of contributory fault.

The next three Points Relied On will be considered together because they raise the question whether the Jarrells made a submissible case of strict liability for a defective product. In support of this contention Fort Worth complains: (1) there was no evidence that the conveyor was in the same condition at the time of the accident as it was when it was sold to Swift; (2) that the

parts it supplied Swift were substantially changed after they were sold to Swift; (3) plaintiffs failed to prove that the ice conveyor was in a defective condition, or unreasonably dangerous when put to a reasonably anticipated use; and (4) there was no evidence that the alternative and safer design proposed by the plaintiffs' was technically feasible and practical in terms of cost, and the overall design and operation of the conveyor.

In reviewing the trial court's ruling on Fort Worth's Motion for Directed Verdict we must view the evidence in a light most favorable to the Jarrells and accept such evidence as true. We must give plaintiffs the benefit of all favorable inferences reasonably drawn from said evidence and disregard the evidence of defendant except insofar as it aids plaintiffs' case. *Braun v. General Motors Corp.,* 579 S.W.2d 766, 769[3] (Mo.App.1979); *Crain v. Webster Elec. Cooperative,* 568 S.W.2d 781, 787[6] (Mo.App.1978).

Following Restatement (Second) of Torts § 402A (1965), (hereinafter "Restatement"), and consistent with Missouri law on design defects, the Jarrells had to prove: (1) the conveyor, at the time it was sold, was in a defective condition unreasonably dangerous for use by Mr. Jarrell; (2) the conveyor reached the Swift plant without substantial change from the condition in which it was sold; (3) the accident was proximately caused by the design defect; and (4) the conveyor was being used at the time of the accident in a manner reasonably anticipated by Fort Worth. *Vanskike v. A.C.F. Industries, Inc.,* 665 F.2d 188, 194 (8th Cir.1981) cert. den., 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *Keener v. Dayton Electric Manufacturing Co.,* supra.

The evidence was that the conveyor system was originally assembled at Fort Worth's factory, where the pieces making up the system were then "match marked" to make clear which pieces connected with other pieces. The system was then disassembled and shipped to the Swift plant

where maintenance people reassembled the conveyor following the accompanying instructions furnished them by Fort Worth "to the letter." There was testimony by Denzel Morgan that he was one of the two people who reassembled the conveyor at the Swift plant and to his knowledge no alterations were made on the machine from the time of its installation and the time he left the Swift plant in 1974. Mr. Jarrell, who entered Swift's employment in 1973, was made head of maintenance three months later and he testified that he never made any changes on, nor modified the ice conveyor system in any way other than normal maintenance, e.g., replacing worn shear pins.

Fort Worth suggests that the wiring of the conveyor system substantially changed the conveyor and shifted responsibility for discovery and prevention of defects to the party who installed the wiring.

■■■■ While Fort Worth supplied only the mechanical components of the conveyor and did not supply any electrical wiring and controls, it did design the conveyor and placed the access doors on it knowing, even at the earliest stages of design, that it would be necessary that the engine and controls be connected, because without power, the conveyor could not be operated. It was Fort Worth that specified that a 10 horsepower engine be used as the power source for the system. The addition of this engine and the wiring necessary for the conveyor to operate can hardly constitute a substantial change in the conveyor as it was designed and manufactured. The wiring was a necessary and clearly forseeable requisite for the operation of the conveyor. Subsequent changes or alterations in a product do not relieve the manufacturer of strict liability if the changes were foreseeable and do not render the product unsafe. Vanskike, supra, l.c. 195[2]; *Hales v. Green Colonial, Inc.,* 490 F.2d 1015, 1020[4] (8th Cir.1974).

■■■■ The Jarrells' theory of defective design was the location of the inspection door on the conveyor; and it was defective and unreasonably dangerous because the shear pins were not visible through the inspection door's opening, necessitating the placing of one's hands into the conveyor housing in order to feel if the shear pins had sheared. The experts for Jarrell testified that the location of this access door was defective and unreasonably dangerous independent of any alleged electrical problems with the system.

The location of this access door in relation to the shear pins was in no way affected by the electrical wiring by a third party. In fact, Fort Worth never challenged the expertise of the party who installed the engine nor the wiring.

It is our opinion that a jury of reasonably prudent people could have agreed with the Jarrells' experts that had the access door been properly located, Mr. Jarrell would never have been required to insert his arm into the housing to feel if the shear pins had sheared and thereby sustain the injuries he did. There was substantial evidence that the access door was in the same location and condition as it always had been since the manufacture of the conveyor and that the defective placement of the access door was the proximate cause of Mr. Jarrell's injuries.

What we have said disposes of Fort Worth's argument that the Jarrells failed to prove that the product was in a defective condition, and unreasonably dangerous, when put to an anticipated use.

■■■ The testimony of Mr. Jarrell and the experts he produced at trial was that because of the conveyor's design, the access door, in its location relative to the shear pins, was improperly located, and as located, required one inspecting the conveyor to ascertain whether the shear pins had sheared by inserting his arm into the conveyor's housing. One of the Jarrells' experts testified that Fort Worth, as the designer and manufacturer, should have reasonably anticipated that maintenance people would insert their arms into the auger housing to feel the shear pins. By design these shear pins were intended to be the weakest component of the conveyor system

to guard against engine burnout. Testimony also supported a finding that the quickest and most simple method for checking the shear pins was to insert an arm into the housing; the alternative required the removal of some twenty bolts and a large cover from the auger shaft. Even if the latter method of inspection was preferable to the former in terms of lesser risk, failure of the vendor to properly inspect and repair is within the foreseeable risk of the manufacturer: *Vanskike*, supra, l.c. 195[3–5]; *Willey v. Fyrogas Co.*, 363 Mo. 406, 251 S.W.2d 635, 641[5] (Mo.1952).

■ Similarly, where there is both a design defect and misuse of the product, each of which contributes to an accident, the misuse does not become an intervening cause if the misuse was foreseeable. Vanskike, supra, l.c. 195, and cases cited therein. "The realities of the intended and actual use are well known to the manufacturer and to the public and these realities should be squarely faced by the manufacturer and the court." *Polk v. Ford Motor Co.*, 529 F.2d 259, 264 (8th Cir.1976), cert. den., 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976), *citing Larsen v. General Motors Corp.*, 391 F.2d 495, 502–503[9] (8th Cir. 1968).

There is evidence in the record that pin-shearing was a common occurrence incident to the operation of the conveyor and that Fort Worth was aware, even at the initial design stages, of the need and virtual certainty of maintenance people coming into close contact with the auger in order to replace the shear pins.

The Jarrells' experts also testified that in addition to improperly locating the access door on the conveyor, a designer of a conveyor system of this kind should take into account the sources of power to be used to generate the mechanical hardware even though it did not intend to market the electrical components itself. Both experts testified that an "interlock" device should have been part of the original design of the ice conveyor's access door. Had the access door been designed with an interlock the machine would not have started up while the access door was open.

■ The test of whether a product is defective when sold is whether the product is unreasonably dangerous to the consumer or user given the conditions and circumstances that will foreseeably attend the use of the product. *Kennedy v. Custom Ice Equipment Co., Inc.*, l.c. 178[4]. Utilizing this test, the jury could have found that Mr. Jarrell's placing of his arm into the access plate to search for damaged shear pins was a foreseeable circumstance that required the incorporation of protective interlocks or electrical cut-out devices within the conveyor's design.

We rule these Points against appellant.

■ Fort Worth also contends that the Jarrells failed to make a submissible case of strict liability in Tort because there is no evidence that the "alternative and safe design proposed by the plaintiffs was technically feasible and practical in terms of cost and in the overall design and operation of the conveyor system." This issue—commonly referred to as the risk—versus—utility product doctrine—is presented for the first time in appellant's brief in this court and therefore has not been preserved for review. There is no "technically feasible and practical in terms of cost" language in Fort Worth's Motion for Directed Verdict at the close of plaintiffs' evidence, defendant's Motion for Directed Verdict at the close of all the evidence, nor in defendant's Motion for New Trial. This allegation of trial court error comes too late, is not preserved for review, and we do not, therefore, afford it review. Rule 29.11(d); *State v. Gibson*, 633 S.W.2d 101, 107[5] (Mo.App.1982). Rule 29.11(d) is not to be selectively enforced; it is to be strictly enforced, and the sound reason for it is that all such objections should first be presented at the trial or in the motion for new trial, to the trial court. *Chambers v. Kansas City*, 446 S.W.2d 833, 840[9] (Mo. 1969).

Fort Worth also challenges the submission of the case to the jury under Instruc-

tion Nos. 5 and 6, and contends submission under these instructions was prejudicial because they failed to define the terms "defective" and "unreasonably dangerous." We find this complaint to be without merit.

■ These instructions are MAI 25.04 instructions.[2] Defendant incorporated these instructions in the Statement of Facts portion of its brief rather than in the Argument portion of its brief as required by Rule 84.04(e), and for that reason alone we could refuse to consider this Point. However since defendant candidly admits MAI does not require a definition of these two terms, and that presumably any such definition would be an impermissible deviation from the Missouri Approved Jury Instructions, we merely record our agreement with this concession. Nevertheless, because it opines that some definition of the terms is essential, it asks us to reverse this judgment despite the mandate of Rule 70.02(b), that whenever Missouri Approved Jury Instructions contain an instruction applicable in a particular case which the appropriate party requests or the court decides to submit, such instruction shall be given *to the exclusion of any other on the subject.*

■ The Committee's comment under "Notes on Use" following MAI 25.04 (1978 Revision) states: "This instruction is intended for use both in cases involving a manufacturing defect and in cases involving a design defect." Clearly MAI 25.04 is the applicable instruction to the instant proceedings. Where a Missouri Approved Jury Instruction is applicable, its use is mandatory and failure to use the mandatory instruction is presumed to be prejudicial error. *Eckert v. Dishon,* 617 S.W.2d 649, 650[1] (Mo.App.1981); *McGowan v. Hoffman,* 609 S.W.2d 160, 164[2] (Mo.App. 1980).

We have been cited no Missouri authority requiring a trial court to define the terms "defective" and "unreasonably dangerous."

In our review of the record we find no evidence that defendant requested or tendered an instruction defining these terms in the trial court prior to submission to the cause to the jury. We rule this point against Fort Worth.

Fort Worth next contends that the trial court erred in refusing to grant it an opportunity to remove the cause to the United States District Court for the Eastern District of Missouri after it directed a verdict in favor of defendant R.J. McCullough.

■ A cause of action, which when instituted is not removable because of the presence in the case of a resident defendant, may become removable if that party goes out of the case by reason of a voluntary action on the part of the plaintiff. *Self v. General Motors Corp.,* 588 F.2d 655, 659[4] (9th Cir.1978); *Continental Oil Company v. PPG Industries, Inc.,* 355

**2.**
INSTRUCTION NO. 5

Your verdict must be for plaintiff James Jarrell if you believe:
First, defendant manufactured and sold the screw conveyor in the course of defendant's business, and
Second, the screw conveyor was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and
Third, the screw conveyor was used in a manner reasonably anticipated, and
Fourth, plaintiff James Jarrell was damaged as a direct result of such defective condition as existed when the screw conveyor was sold and manufactured, unless you believe plaintiff James Jarrell is not entitled to recover by reason of Instruction No. 8.
MAI 25.04.

INSTRUCTION NO. 6

Your verdict must be for plaintiff Gayle Jarrell if you believe:
First, defendant manufactured and sold the screw conveyor in the course of defendant's business, and
Second, the screw conveyor was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and
Third, the screw conveyor was used in a manner reasonably anticipated, and
Fourth, plaintiff James Jarrell was damaged as a direct result of such defective condition as existed when the screw conveyor was manufactured and sold and as a direct result of such damage plaintiff Gayle Jarrell sustained damage, unless you believe plaintiff James Jarrell is not entitled to recover by reason of Instruction No. 8.
MAI 25.04 & 31.04

F.Supp. 1183, 1185[1, 2] (S.D.Tex.1973). Where a plaintiff voluntarily dismisses, discontinues or abandons an action against the resident defendant, the cause then becomes removable and may, with prompt action, be removed by the non-resident defendants to federal court. *Stamm v. American Telephone & Telegraph Co.*, 129 F.Supp. 719, 721[5] (W.D.Mo.1955).

"However, it seems to be equally well settled that an involuntary discontinuance as to a resident defendant, as by order of court *or directed verdict* does not make the case against the remaining non-resident defendant removable." *Hum v. Missouri Pacific Railroad Co.*, 292 F.Supp. 65, 66[1] (E.D.Ark.1968) and cases cited therein. (Emphasis supplied).

 At the time this action was commenced Fort Worth was a Texas Corporation with its principal place of business in Fort Worth, Texas. The Jarrells and Mr. McCullough were Missouri residents. Inasmuch as Mr. McCullough and Fort Worth were joined as co-defendants, Fort Worth was not entitled to remove the cause to the United States District Court because complete diversity was lacking. 28 U.S.C. §§ 1332 and 1441.

 Fort Worth alleges that the sole reason the Jarrells joined Mr. McCullough as a party defendant in this action was to prevent removal of the cause to the Federal Court, and that the Jarrells never intended to pursue any action against him. After a thorough review of the record we do not agree with this conclusion of Fort Worth.

Mr. McCullough entered his appearance in this action by attorney of record in the filing of a Motion to Dismiss on September 7, 1978. This Motion was argued and overruled on May 2, 1979. A default and inquiry was entered as to Mr. McCullough on June 10, 1979. The Jarrells filed a Second Amended Petition on July 10, 1980, and a Third Amended Petition on August 5, 1980; in each one Mr. McCullough was a named defendant.

During voir dire examination of the jury the Jarrells' trial counsel informed the prospective jurors that the action was against Fort Worth and Mr. McCullough and in his opening statement he outlined what he hoped to prove concerning Mr. McCullough, i.e. that he was negligent in failing to keep the conveyor's stop button depressed, which, combined with the absence of backup safety devices proximately caused plaintiff's injuries.

Mr. McCullough was represented by counsel during the course of the trial, and it was this counsel who made the Motion for Directed Verdict at the close of all of the evidence which was sustained; not confessed.

While it may be arguable whether a zealous effort was made to make a submissible case against Mr. McCullough, it cannot be said that the Jarrells voluntarily abandoned their case against him.

Fort Worth's reliance on *Heniford v. American Motors Sales Corp.*, 471 F.Supp. 328 (D.S.C.1979) is misplaced because in that case the plaintiffs had effectively discontinued the action against the resident defendant by telling the jury not to render a verdict against him and that they were not actually suing him.

*Stamm v. American Telephone and Telegraph Company*, 129 F.Supp. 719 (W.D.Mo.1955) is of no help to appellant. The resident defendant in *Stamm* was never served with process and did not enter his appearance. Despite the failure of the plaintiff to obtain service on the resident defendant the District Court in sustaining the plaintiff's motion to remand said, 129 F.Supp. l.c. 721[4].

All that petitioning defendants point to is that, since the non-est return, made January 28, 1953, on the summons issued for defendant Tatum, plaintiff had not, prior to the removal on March 3, 1955, sued out an alias summons for him. I have not been able to find a case holding that this shows a voluntary dismissal, abandonment, or other discontinuance of the action by the plaintiff....

The resident defendant here had made an appearance and was represented by counsel at trial who made the motion to dismiss which was sustained by the trial court.

From the evidence adduced at trial one cannot effectively argue that grounds did not exist for joining Mr. McCullough who exercised some control over the start-stop switch in close proximity to the site where the injury occurred and who, with full knowledge of the intention of Mr. Jarrell to insert his arm into the conveyor housing to inspect the shear pins, apparently failed to keep the stop button depressed.

The United States Supreme Court has developed the "voluntary—involuntary" rule which denies removal of a case once instituted in a state court unless the plaintiff by some voluntary act on his part renders the case removable. *Self v. General Motors Corp.*, supra, l.c. 657[4], analyzing *Powers v. Chesapeake & O. Ry.*, 169 U.S. 92, 18 S.Ct. 264, 42 L.Ed. 673 (1898) and cases cited therein. Mr. McCullough was not voluntarily dismissed nor abandoned from this case; he went out as the result of an order of the trial court.

We rule this Point against appellant.

Fort Worth's final Point is that the trial court erred and abused its discretion in failing to grant its request for remittitur since the verdict is unjustified by the evidence and exceeds the upper limits of fair compensation in light of the evidence and in light of awards in Missouri for similar injuries.

■■■■ While an appellate court has the authority to determine that a jury verdict exceeds the maximum amount which the evidence will support as a matter of law, the assessment of damages is primarily the function of the jury, whose duty it is to award such sum as reasonably will compensate the parties for the injuries sustained. *Gathright v. Pendegraft*, 433 S.W.2d 299, 317[32] (Mo.1968); *Arkansas-Missouri Power Co., v. Haines*, 592 S.W.2d 883, 885[4] (Mo.App. banc 1980). When a request for remittitur is presented to the trial court and overruled, such decision is subject to reversal on review only upon a showing of an abuse of the trial court's discretion. *Morris v. Israel Brothers, Inc.*, 510 S.W.2d 437, 447[13] (Mo.1974); *Woodford v. Illinois Central Gulf Railroad Co.*, 518 S.W.2d 712, 718[13–17] (Mo.App.1974).

See *Tenner v. General Motors, Corp.*, 625 S.W.2d 218, 229[17] (Mo.App.1981).

■■■■ In reviewing whether a verdict is excessive only the evidence favorable to the plaintiff will be considered. *Woodford, supra*, at 178[16]. Viewed in this light the evidence was that Mr. Jarrell's loss of past and future wages ranged from a "high" present value of $800,000.00, assuming he never worked again, to a "low" of $528,061.00, assuming he was able to secure a job paying the equivalent of $10,000.00 annually. At time of trial he was unemployed. Since he sustained his injuries he had been hired on two or three jobs but each time was let go with the longest period of employment being about one year.

Mr. Jarrell's right arm was totally and traumatically torn off by the conveyor auger and part of his back at the shoulder is missing. All of the muscle structure of the shoulder is gone. He testified that he suffers from phantom limb pain and that the pain in his right side bothers him twenty-four hours a day, and has worsened since the time of the mishap. He sleeps only every second or third night and is comfortable only when sitting in a "steam kit," or when his wife applies hot towels to his stump area. He has traveled to specialty medical centers in St. Louis and Memphis where he was advised that there is nothing anyone can do to improve his condition. His prosthesis is of no use to him other than cosmetically. In addition to his physical problems he suffers emotional irritability, moodiness and depression. Prior to this incident he was in excellent health and an accomplished amateur athlete.

Throughout its case in chief, Fort Worth elicited not a scintilla of evidence relative to the damages in this action. Defense counsel never presented to the jury an alternative method for calculating Mr. Jarrell's losses. All counsel did was conduct a general cross-examination of the Jarrells' expert economist and remarked during argument relative to how one can get an economist to come into court and "say anything."

The jury heard only one version of what the Jarrells' damages were. This version

**840**

included evidence of the traumatic circumstances surrounding the loss of Mr. Jarrell's right arm; his lost wages—past, present and future; the loss and enjoyment of the use of his right arm; his dependence on his wife; and, finally, the total destruction of a way of life the Jarrells were accustomed to.

Fort Worth cites *Mantz v. Southwest Freight Lines*, 377 S.W.2d 414 (Mo.1964) as authority for its contention that the jury verdict is out of line with other Missouri verdicts. The Supreme Court held in Mantz that an award of $250,000.00, including $40,950.00 special damages, to a 44 year old automobile race driver with better than average income from racing and other related activities for permanently disabling injuries, including amputation of his left arm above the elbow and multiple fractures of the right foot, femur and hip causing permanent limitation of motion, was excessive by $50,000.00.

In *Woods v. Nichols*, 416 So.2d 659, 671[9] (Miss.1982) the court said: "It is true that just a few years ago a judgment for half the size of these verdicts would have been considered excessive, but that was before 5¢ magazines sold for 50¢, and a $25.00 suit sold for $100.00." The judgment in Woods was for $550,000.00.

The *Mantz* decision was rendered in 1964; sixteen years prior to the judgment in this case, and the plaintiff in that case had a history of traumatic injuries sustained in accidents which occurred while he was engaged in his profession as a race car driver, but they did not preclude him for more than 18 years from continuing in the racing business.

The trial court heard the evidence and had the opportunity to observe the Jarrells throughout the trial. It also had the opportunity to observe the jury during trial. The term "excessive," when used within the context of jury verdicts, has been construed to mean that the verdict is of such magnitude that it shocks the conscience of the court. *Green v. Crunder Martin Mfg. Co.*, 575 S.W.2d 930, 934[10] (Mo.App.1978). Because of the broad discretion allowed the jury in fixing the award of damages, the fact that the trial court's conscience was not shocked by the size of the jury verdict as demonstrated by its denial of Fort Worth's new trial motion when the question of excessiveness was raised, and that the evidence must be viewed in a light most favorable to the Jarrells, we reach the conclusion that the damages award, while substantial, is not excessive nor manifestly unjust.[3] We hold that the trial court did not abuse its discretion in failing to grant Fort Worth's request and order a remittitur.

The judgment of the Circuit Court is affirmed.

PUDLOWSKI, P.J., and SMITH, J., concur.

---

**3.** See *Pepper v. Demison Div. of Abex Corp.*, 239 N.W.2d 704 (Mich.App.1976) when a jury award of $1,750.000.00 to a 67 year old man and his wife for the husband's loss of an arm in a machine was reinstated by the appellate court where the trial court had cut the verdict to $725,000.00.