909 F.2d 1150
 Prod.Liab.Rep.(CCH)P 12,549
Sandra Lynn LINEGAR, individually and as next friend for
Jennifer Nicole Linegar and James Michael Linegar, Appellee,
v.
ARMOUR OF AMERICA, INC., Appellant.
 No. 89-1535.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 16, 1990.
Decided July 26, 1990.
 
 Hugh C. Griffin, Chicago, Ill., for appellant.
 William W. Francis, Jr., Springfield, Mo., for appellee.
 Before ARNOLD and BOWMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 This action was brought as a products liability case and heard under the District Court's diversity jurisdiction. Armour of America, Inc. (Armour) appeals a judgment based on a jury verdict in favor of the widow and children of Jimmy Linegar, a Missouri State Highway Patrol trooper who was killed in the line of duty. The jury found that the bullet-resistant vest manufactured by Armour and worn by Linegar at the time of the murder was defectively designed, and it awarded his family $1.5 million in damages. We reverse.
 
 
 2
 On April 15, 1985, as part of a routine traffic check, Linegar stopped a van with Nevada license plates near Branson, Missouri. The van's driver produced an Oregon operator's license bearing the name Matthew Mark Samuels. Linegar ascertained from the Patrol dispatcher that the name was an alias for David Tate, for whom there was an outstanding warrant on a weapons charge. Linegar did not believe the driver matched the description the dispatcher gave him for Tate, so he decided to investigate further.
 
 
 3
 A fellow trooper, Allen Hines, who was working the spot check with Linegar, then approached the passenger's side of the van while Linegar approached the driver's side. After a moment of questioning, Linegar asked the driver to step out of the van. The driver, who was in fact David Tate, brandished an automatic weapon and fired at the troopers first from inside and then from outside the van. By the time Tate stopped firing, Hines had been wounded by three shots and Linegar, whose body had been penetrated by six bullets, lay dead or dying.[1] None of the shots that hit the contour-style, concealable protective vest Linegar was wearing--there were five such shots--penetrated the vest or caused injury. The wounds Linegar suffered all were caused by shots that struck parts of his body not protected by the vest.
 
 
 4
 The Missouri State Highway Patrol issued the vest to Linegar when he joined the Patrol in 1981. The vest was one of a lot of various sizes of the same style vest the Patrol purchased in 1979 directly from Armour. The contour style was one of several different styles then on the market. It provided more protection to the sides of the body than the style featuring rectangular panels in front and back, but not as much protection as a wrap-around style. The front and back panels of the contour vest, held together with Velcro closures under the arms, did not meet at the sides of the wearer's body, leaving an area along the sides of the body under the arms exposed when the vest was worn. This feature of the vest was obvious to the Patrol when it selected this vest as standard issue for its troopers and could only have been obvious to any trooper who chose to wear it. The bullet that proved fatal to Linegar entered between his seventh and eighth ribs, approximately three-and-one-fourth inches down from his armpit, and pierced his heart.
 
 
 5
 The theory upon which Linegar's widow and children sought and won recovery from Armour was strict liability in tort based on a design defect in the vest. On appeal, Armour challenges: (1) the sufficiency of the evidence to make a submissible case of strict liability in tort; (2) the District Court's refusal to allow proof of or submit to the jury Armour's government contractor immunity defense; (3) the court's refusal to allow evidence of or submit to the jury Armour's defense of contributory negligence; (4) the court's response to the jury's question concerning the phrase "defective condition" as used in the verdict director; and (5) various evidentiary rulings that Armour terms "inconsistent." Because we hold that, as a matter of law, the evidence was insufficient to present a submissible products liability case, we need not and do not reach any of Armour's other claims of error.
 
 
 6
 Our standard of review is well settled. In considering Armour's contention that the District Court erred in denying Armour's motions for directed verdict and judgment notwithstanding the verdict, we must "review[ ] the entire record in the light most favorable to the party opposing the motion." Laney v. Coleman Co., 758 F.2d 1299, 1303 (8th Cir.1985). And we must do so mindful of the requirements of the governing substantive law for the imposition of liability.
 
 
 7
 The parties agree that Missouri substantive law controls in this diversity case. Under Missouri products liability law, plaintiff potentially had available to her three theories of recovery: negligence, strict liability, and breach of warranty. Ragland Mills, Inc. v. General Motors Corp., 763 S.W.2d 357, 359 (Mo.Ct.App.1989). In 1969, the Missouri Supreme Court adopted section 402A of the Restatement (Second) of Torts, which imposes strict liability in tort upon sellers and manufacturers for selling "any product in a defective condition [un]reasonably dangerous to the user or consumer" that results in injury to the user or consumer. Keener v. Dayton Elec. Mfg. Co., 445 S.W.2d 362, 364 (Mo.1969) (quoting Restatement (Second) of Torts Sec. 402A).[2] The strict liability theory is further divided into liability for defective design of a product and liability for failure to warn of an inherent danger in the product. See, e.g., Blevins v. Cushman Motors, 551 S.W.2d 602 (Mo.1977) (en banc) (defective design); Grady v. American Optical Corp., 702 S.W.2d 911 (Mo.Ct.App.1985) (failure to warn).[3] Although here the first amended complaint stated claims against Armour on all of Missouri's products liability theories,[4] plaintiff later elected to dismiss all claims except Count I, strict liability for defective design, Joint Appendix Vol. I at 8-22 (complaint), Vol. II at 556-59 (motion in limine including motion to dismiss all claims except Count I), and the case was submitted to the jury only on that theory.
 
 
 8
 To recover under a theory of strict liability in tort for defective design, Missouri law requires that a party prove the following elements:
 
 
 9
 (1) [the] defendant sold the product in the course of its business;
 
 
 10
 (2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use;
 
 
 11
 (3) the product was used in a manner reasonably anticipated;
 
 
 12
 (4) [the] plaintiff was damaged as a direct result of such defective condition as existed when the product was sold.
 
 
 13
 Fahy v. Dresser Indus., 740 S.W.2d 635, 637-38 (Mo.1987) (en banc), cert. denied, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). The jury instructions in this case tracked the applicable law.[5]
 
 
 14
 While there is some dispute between the parties over various of the elements, we predicate our reversal on the dearth of plaintiff's evidence of element (2). We conclude that, as a matter of law, the contour vest Trooper Linegar was wearing when he was murdered was not defective and unreasonably dangerous.
 
 
 15
 Under the Missouri law of strict liability in tort for defective design, before a plaintiff can recover from the seller or manufacturer he must show that "the design renders the product unreasonably dangerous." Nesselrode v. Executive Beechcraft, Inc., 707 S.W.2d 371, 377 (Mo.1986) (en banc). Ordinarily, that will be a jury question, and "the concept of unreasonable danger, which is determinative of whether a product is defective in a design case, is presented to the jury as an ultimate issue without further definition," id. at 378, as it was here. In this case, however, there was simply no evidence that the vest's design made it unreasonably dangerous, and the District Court should have declared that, as a matter of law, the vest was not defective, and directed a verdict or granted judgment for Armour notwithstanding the verdict. See Racer v. Utterman, 629 S.W.2d 387, 394 (Mo.Ct.App.1981) ("Unless a court can say as a matter of law that the product is not unreasonably dangerous the question is one for the jury."), cert. denied, 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982).
 
 
 16
 The Missouri cases leave the meaning of the phrase "unreasonably dangerous" largely a matter of common sense, the court's or the jury's. The Missouri Supreme Court has stated, however, that a product is defectively designed if it "creates an unreasonable risk of danger to the consumer or user when put to normal use." Nesselrode, 707 S.W.2d at 375. Among the factors to be considered are "the conditions and circumstances that will foreseeably attend the use of the product." Jarrell v. Fort Worth Steel & Mfg. Co., 666 S.W.2d 828, 836 (Mo.Ct.App.1984). The conditions under which a bullet-resistant vest will be called upon to perform its intended function most assuredly will be dangerous, indeed life-threatening, and Armour surely knew that. It defies logic, however, to suggest that Armour reasonably should have anticipated that anyone would wear its vest for protection of areas of the body that the vest obviously did not cover.
 
 
 17
 Courts applying Missouri law also have applied what has become known as the "consumer expectation" test for unreasonable dangerousness: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts Sec. 402A comment i (1965); accord id. comment g; see Cowens v. Siemens-Elema AB, 837 F.2d 817, 822 (8th Cir.1988) (applying Missouri law); Aronson's Men's Stores, Inc. v. Potter Elec. Signal Co., 632 S.W.2d 472, 474 (Mo.1982) (en banc). But see Nesselrode, 707 S.W.2d at 377 ("[W]e have not yet formally incorporated, in any meaningful way, the Restatement's onsumer expectation test into the lexicon of our products liability law.").
 
 
 18
 The consumer expectation test focuses attention on the vest's wearer rather than on its manufacturer. The inherent limitations in the amount of coverage offered by Armour's contour vest were obvious to this Court, observing a demonstration from the bench during oral argument, as they would be to anyone with ordinary knowledge, most especially the vest's wearer. A person wearing the vest would no more expect to be shielded from a shot taken under the arm than he would expect the vest to deflect bullets aimed at his head or neck or lower abdomen or any other area not covered by the vest.
 
 
 19
 Plaintiff insists that the user's expectations should not be considered by us, since doing so would effectively afford Armour the benefit of the "open and obvious" defense, inappropriate, they say, in a defective design strict products liability action. We disagree. Although not conclusive, "[t]he obviousness of a defect or danger is material to the issue whether a product is 'unreasonably dangerous'." McGowne v. Challenge-Cook Bros., 672 F.2d 652, 663 (8th Cir.1982) (applying Missouri law in failure to warn case); accord Hylton v. John Deere Co., 802 F.2d 1011, 1015 (8th Cir.1986) (applying Missouri law in design defect case). Here, the vest's purported dangerous defect--its lack of closure at the sides--could not have been more open and obvious. An otherwise completely effective protective vest cannot be regarded as dangerous, much less unreasonably so, simply because it leaves some parts of the body obviously exposed.[6] See Richardson v. Holland, 741 S.W.2d 751, 754 (Mo.Ct.App.1987) (no recovery in strict liability in tort against manufacturer of handgun because product was not defective and dangerousness was obvious); Aronson's Men's Stores, Inc., 632 S.W.2d at 474 (no recovery in strict liability in tort against manufacturer of burglar alarm because, although arguably defective, it was not unreasonably dangerous).
 
 
 20
 We have no difficulty in concluding as a matter of law that the product at issue here was neither defective nor unreasonably dangerous. Trooper Linegar's protective vest performed precisely as expected and stopped all of the bullets that hit it. No part of the vest nor any malfunction of the vest caused Linegar's injuries. See Richardson, 741 S.W.2d at 754 ("The cases uniformly hold that the doctrine of strict liability under the doctrine of 402A is not applicable unless there is some malfunction due to an improper or inadequate design or defect in manufacturing."). The vest was designed to prevent the penetration of bullets where there was coverage, and it did so; the amount of coverage was the buyer's choice. The Missouri Highway Patrol could have chosen to buy, and Armour could have sold the Patrol, a vest with more coverage; no one contests that. But it is not the place of courts or juries to set specifications as to the parts of the body a bullet-resistant garment must cover. A manufacturer is not obliged to market only one version of a product, that being the very safest design possible. If that were so, automobile manufacturers could not offer consumers sports cars, convertibles, jeeps, or compact cars. All boaters would have to buy full life vests instead of choosing a ski belt or even a flotation cushion. Personal safety devices, in particular, require personal choices, and it is beyond the province of courts and juries to act as legislators and preordain those choices.
 
 
 21
 In this case, there obviously were trade-offs to be made. A contour vest like the one here in question permits the wearer more flexibility and mobility and allows better heat dissipation and sweat evaporation, and thus is more likely to be worn than a more confining vest. It is less expensive than styles of vests providing more complete coverage. If manufacturers like Armour are threatened with economically devastating litigation if they market any vest style except that offering maximum coverage, they may decide, since one can always argue that more coverage is possible, to get out of the business altogether. Or they may continue to market the vest style that, according to the latest lawsuit, affords the "best" coverage. Officers who find the "safest" style confining or uncomfortable will either wear it at risk to their mobility or opt not to wear it at all. See Transcript Vol. II at 333 (testimony of Missouri Highway Patrol Trooper Don Phillips that he continued to wear the Armour contour-style vest with his summer uniform, even though the Patrol had issued him a wrap-around vest). Law enforcement agencies trying to work within the confines of a budget may be forced to purchase fewer vests or none at all. How "safe" are those possibilities? "The core concern in strict tort liability law is safety." Nesselrode, 707 S.W.2d at 375. We are firmly convinced that to allow this verdict to stand would run counter to the law's purpose of promoting the development of safe and useful products, and would have an especially pernicious effect on the development and marketing of equipment designed to make the always-dangerous work of law enforcement officers a little safer.
 
 
 22
 The death of Jimmy Linegar by the hand of a depraved killer was a tragic event. We keenly feel the loss that this young trooper's family has suffered, and our sympathies go out to them. But we cannot allow recovery from a blameless defendant on the basis of sympathy for the plaintiffs. To hold Armour liable for Linegar's death would cast it in the role of insurer for anyone shot while wearing an Armour vest, regardless of whether any shots penetrated the vest. That a manufacturer may be cast in such a role has been soundly rejected by courts applying Missouri law. E.g., Laney, 758 F.2d at 1302; Nesselrode, 707 S.W.2d at 375; Baker v. International Harvester Co., 660 S.W.2d 21, 23 (Mo.Ct.App.1983); Brawner v. Liberty Indus., 573 S.W.2d 376, 377 (Mo.Ct.App.1978).
 
 
 23
 The judgment of the District Court is reversed. The District Court shall enter a final judgment in favor of Armour.
 
 
 
 [1]
 After an intensive week-long manhunt, David Tate was arrested and later convicted of capital murder
 
 
 [2]
 Keener misquotes section 402A of the Restatement (Second) of Torts by substituting "reasonably" for "unreasonably." Subsequent Missouri cases reflect that the correct phrase, and the one adopted by Missouri, is in fact "unreasonably dangerous." See, e.g., Fahy v. Dresser Indus., 740 S.W.2d 635, 637 (Mo.1987) (en banc), cert. denied, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); Blevins v. Cushman Motors, 551 S.W.2d 602, 607 (Mo.1977) (en banc)
 
 
 [3]
 Since this claim accrued, Missouri has codified the two strict liability causes of action. Mo.Rev.Stat. Sec. 537.760 (Supp.1989)
 
 
 [4]
 The first amended complaint also alleged the same claims against the manufacturer of the automatic weapon Tate used in the murder. Plaintiff later dismissed that party. Joint Appendix Vol. I at 52
 
 
 [5]
 The relevant instructions were as follows:
 Instruction No. 6
 Your verdict must be for plaintiffs if you believe:
 First, the soft body armor was, at the time it was manufactured and sold by Armour of America, Inc., in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and
 Second, the soft body armor was used in a manner reasonably anticipated, and
 Third, such defective condition directly caused or directly contributed to cause the death of Jimmie Linegar.
 Instruction No. 7
 Your verdict must be for defendant unless you believe:
 First, the soft body armor was, at the time it was manufactured and sold by Armour of America, Inc., in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and
 Second, such defective condition directly caused or directly contributed to cause the death of Jimmie Linegar.
 
 
 [6]
 The wrap-around vest style advocated by appellees as preferable still must have an armhole that will be open some distance below the armpit to allow freedom of movement. See, e.g., Transcript Vol. II at 334 (testimony of Missouri Highway Patrol Trooper Don Phillips that his wrap-around-style vest left a four-inch opening beneath his armpit)