James SPECK and Judy
Speck, Appellants,

v.

ABELL–HOWE COMPANY, Respondent.

No. WD 45428.

Missouri Court of Appeals,
Western District.

Aug. 18, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 29, 1992.

Application to Transfer Denied
Nov. 24, 1992.

John B. Schwabe II, Glenn Edward Easley, Paul T. Krispin, Jr., John B. Schwabe II and Associates, Columbia, for appellants.

Hamp Ford, Susan Ford Robertson, Knight, Ford, Wright, Atwill, Parshall & Baker, Columbia, for respondent.

Before HANNA, P.J., and FENNER and ULRICH, JJ.

ULRICH, Judge.

James Speck and Judith Speck, husband and wife, appeal from an adverse judgment following a jury verdict in a product liability action against Abell–Howe Company. The Specks contend that the court erred in overruling their challenge for cause to a venireperson who stated that she was employed as an insurance agent by an agency which sells insurance for defendant's liability insurer, and that the trial court erred in sustaining defendant's objection to appel-

lants' question propounded to appellants' engineering expert asking the meaning of the term "unreasonably dangerous." The judgment is affirmed.

While employed at A.B. Chance Company, Centralia, on November 8, 1983, James Speck was injured. Mr. Speck was employed as a maintenance electrician for the company, in which capacity he had worked for several years prior to the incident.

On November 8, 1983, Mr. Speck went to the plastics department of the A.B. Chance plant to investigate a reported electrical problem with a hoist on a floor-mounted jib crane. The jib crane, manufactured by Abell–Howe Company, included a steel vertical column (or mast) eleven feet, 10 inches high. Atop the mast sat a steel horizontal boom jib fifteen feet, five inches long, weighing approximately one thousand pounds. The jib rested on a pivot at the top of the vertical mast. The jib was shaped to have a counter balance at the "mast" end which rested against the mast. The jib was capable of pivoting in a complete circle around the mast. An electrical hoist was attached to the jib and capable of moving along the entire length of the jib. The electrical hoist contained wiring connections in a "service box" located near the top of the mast on the jib.

In order to investigate the electrical problem involving the hoist located on the jib, Mr. Speck was compelled to elevate himself to the service box located ten or twelve feet high. Although "safety platforms" designed to attach to and raise personnel by forklift were available, Mr. Speck was uncertain where the nearest platform was stored. He on other occasions had improvised by using a wooden parts box as a platform in place of a "safety platform." Mr. Speck caused a wooden parts box to be placed on the forks of a forklift and moved to the jib crane. Mr. Speck climbed into the steel reinforced wooden parts box then resting on the two forks of the forklift. The forklift operator, responding to Mr. Speck's directions, positioned the forklift at the jib crane location and raised the forks, the wooden parts box, and Mr. Speck within the box.

Witnesses disagreed at trial about the exact sequence of events as the wooden box and Mr. Speck were lifted by the forklift. One witness testified that the box, as it was being elevated, contacted the under side of the "head" of the jib causing the box to tilt on the forks and the box, the jib, and Mr. Speck to fall to the floor. Another witness testified that the box had stopped rising and Mr. Speck had begun his work on the joist when the box tilted and fell to the floor. The lift operator testified that he had stopped elevating the box and that Mr. Speck and the box were stationary when the box fell. The operator stated that his hands had been removed from the controls sometime before the accident occurred. He stated that Mr. Speck, the box, and the jib inexplicably fell to the floor. Mr. Speck could not recall the details of the accident.

Mr. Speck sustained injuries from the fall. He experienced a fractured right elbow which required hospitalization and surgical repair. Inability to straighten his right arm at the elbow is permanent. He has less strength in his right (dominant) arm, and he experiences difficulty in his work using tools. Mr. Speck also experiences the inability to engage in some recreational activities.

Appellants' expert testified that the jib crane was dangerous and defective because of defective design. Only gravity maintained the jib to the top of the vertical mast making it susceptible to dislodgment by an upward lifting force. "Antilift-off lugs" were developed by the manufacturer and offered for sale before Mr. Speck's injury. Those devices, if attached to the jib crane, would have resisted upward force and inhibited the jib from falling from the top of the vertical mast.

Abell–Howe's engineering expert testified that lifting by forklift a man in a wooden parts box that is not secured to the lift forks was an industry "safety code" violation. He further testified that raising a workman near the jib crane in such manner was not an activity reasonably foreseeable by the manufacturer of the jib crane, that the jib crane was designed and manu-

factured in conformity with engineering standards, that the unsecured jib atop the vertical mast was not the cause of Mr. Speck's injury. He testified that Mr. Speck's injuries were caused as a result of the upper edge of the elevated, unsecured parts box contacting the bottom edge of the jib as the box was being elevated, causing the box to tilt off the forks and the box and Mr. Speck to fall to the floor. The engineering expert testified that had "anti-lift lugs" secured the jib to the mast, the parts box would still have tilted causing Mr. Speck and the box to fall to the floor.

Former and current A.B. Chance employees testified that the practice of lifting men in wooden parts boxes by forklift was prohibited by A.B. Chance as an unsafe practice at the time Mr. Speck was injured. When circumstances required that an employee be lifted by forklift, the company policy was to require the use of "safety platform" devices. "Safety platform" devices were made to be lifted by forklifts and were designed to prevent the platforms from being knocked from the forks. The "safety platform" was made of steel, and had slots under the platform to facilitate forks fitting into them. The platform also had side rails and other services promoting safe use.

## I

James and Judith Speck claim as their first point on appeal that the trial court erred in overruling their challenge of Melissa Booth for cause during the voir dire process. Mr. and Mrs. Speck contend that Ms. Booth's employment as an insurance agent by an insurance agency which sells insurance for Abell–Howe's liability insurer creates a presumption of bias and prejudice in favor of Abell–Howe and deprives appellants of a full panel of qualified venirepersons. Appellants argue that the trial court lacked discretion to consider whether to grant or deny their motion to strike venireperson Booth for cause.

During the voir dire examination, the Specks' counsel asked questions and Ms. Booth responded:

Mr. Easley: Are any of you or is any member of your immediate family an officer, director, employee, agent, stockholder, policy holder as the case may be of the Home Indemnity Company?

. . . .

Mr. Easley: Anyone else think of anything. Ms. O'Connor?

Venireperson Booth: Melissa Booth.

Mr. Easley: Oh, I'm sorry.

Venireperson Booth: I'm a licensed insurance agent. Our office represents Home Insurance. I do not have any dealings with them directly myself.

Mr. Easley: But your employer does represent the Home Indemnity Company?

Venireperson Booth: Yes, I believe so.

Appellants' counsel challenged Melissa Booth for cause at the conclusion of voir dire, and the court overruled the challenge.

Ms. Booth's affidavit was filed after appellant's motion for new trial was filed and preserved the issue. Ms. Booth's affidavit informs that she is employed by The Insurance Group, Inc., a general insurance agency with authority to write insurance and bind insurance coverage with twenty-five different companies located throughout the United States. Additionally, the affidavit states that Ms. Booth's employer serves as broker in the writing of insurance policies through an additional approximately twenty-five other insurance companies located throughout the United States. Her affidavit further states that her employer and the officers and directors of her employer are not officers, directors, or employees of the Home Insurance Company or the Home Indemnity Company. The Home Insurance Company and the Home Indemnity Company combined, Ms. Booth states, issue only about one percent of the insurance policies written through Ms. Booth's employer. Ms. Booth further states in her affidavit that, "I do not know and have never worked in connection with any insurance written through, for or by Home Insurance Company or Home Indemnity Company," and that she has never been employed by either of the two companies. Ms. Booth states that she is a salaried employee, that she is not paid commissions, and that her

salary is not dependent on the volume of insurance written or collected by her employer. Additionally, Ms. Booth states in her affidavit that, when she was questioned during voir dire, she was uncertain whether her employer did business with Home Insurance Company or Home Indemnity Company.

■ Trial courts have broad discretion in determining the qualifications of veniremen. *Collins v. West Plains Memorial Hosp.*, 735 S.W.2d 404, 405 (Mo.App.1987). The court in *Collins* stated, "Even though a juror has some business or personal relationship with a party, the trial court has broad discretion in determining the qualifications of such veniremen to sit as jurors and its rulings are not disturbed on appeal unless they are clearly and manifestly wrong." *Id.*

The right to unbiased and unprejudiced jurors is foundational to the judicial process. The Missouri Supreme Court stated in *Kendall v. Prudential Ins. Co. v. America*, 327 S.W.2d 174, 177 (Mo. banc 1959): "It is fundamental that jurors should be thoroughly impartial as between the parties. The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the Constitution."

The facts available to the trial court support the court's denial of appellant's motion to strike Venireperson Booth for cause and appellant's motion for new trial on the same issue. Ms. Booth was not an employee of Home Indemnity Company. Although approximately one percent of the insurance policies that Ms. Booth's employer wrote were written with Home Insurance Company and the Home Indemnity Company, Ms. Booth had no involvement in the acquiring or writing the insurance contracts. Additionally, Ms. Booth, as a salaried employee, received and perceived no additional or diminished remuneration for insurance policies written by her employer with Home Insurance Company or Home Indemnity. When questioned during voir dire, Ms. Booth was uncertain whether her employer ever did business with Home Indemnity Company. Appellants' right to un-

biased and unprejudiced jurors was not breached by the trial court's denial of appellants' motion to strike Venireperson Booth for cause. The trial court did not abuse its discretion. Point I is denied.

## II

■ James and Judy Speck contend as their second point on appeal that the trial court erred in sustaining Abell–Howe's objection to their attorney's question which asked appellants' engineering expert the meaning of "unreasonably dangerous."

The following dialogue occurred between appellants' attorney and H. Boulter Kelsey, Jr., appellants' engineering expert, during direct examination:

Mr. Schwabe: Are you familiar with the term "unreasonably dangerous?"

Mr. Kelsey: Yes, sir.

Mr. Schwabe: What does that mean?

Mr. Ford (respondent's attorney): I'm going to object to that, Your Honor, invades the province of the jury.

The court sustained respondent's objection.

■ MAI 25.04, the verdict directing instruction for cases involving a manufacturing or design defect, was given by the court in this case. Paragraph "Second" of the instruction requires that to find for the plaintiffs, the jury must find the described product was, at the time of the occurrence, in a defective condition and "unreasonably dangerous" when put to a reasonably anticipated use. Missouri authority does not require that the jury be instructed with the definition of the term "unreasonably dangerous." *Jarrell v. Fort Worth Steel & Mfg. Co.*, 666 S.W.2d 828, 837 (Mo.App. 1984). The court in *Jarrell* determined that, because MAI does not require a definition of "unreasonably dangerous," "presumably any such definition would be an impermissible deviation from Missouri Approved Jury Instructions." *Id.*

■ The Supreme Court of Missouri in *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 378 (Mo. banc 1986), stated:

Under our model of strict tort liability the concept of unreasonable danger,

which is determinative of whether a product is defective in a design case, is presented to the jury as an ultimate issue without further definition. (Citation omitted.) Accordingly, our approved jury instruction which governs in a design defect case, MAI 25.04 (3rd) does not contain as one of its component elements a definitional paragraph which gives independent content to a concept of unreasonable danger.

Expert witnesses, because of their superior knowledge, are permitted to expound conclusions of fact and opinions to aid the trier of fact, who lacks the special skill, experience, or knowledge to draw correct conclusions from the facts proved. *Hendricks v. Missouri–Kansas–Texas R.R. Co.*, 709 S.W.2d 483, 492 (Mo.App.1986). The essential test is whether an expert's opinion will aid the jury. *Id.* at 493. Whether an expert's testimony will be admitted or excluded is within the trial court's discretion. *Ryan v. Parker*, 812 S.W.2d 190, 194 (Mo. App.1991).

Appellants' expert testified extensively about the jib crane. Appellants' expert opined that the jib crane was defective by design and dangerous. This testimony was permitted and may reasonably have helped the jury determine whether the jib crane was "unreasonably dangerous," as required by paragraph "second" of MAI 25.-04. However, the trial court's refusal to permit appellants' expert to define the term "unreasonably dangerous" did not abuse the court's discretion. Appellants' point II on appeal is denied.

The judgment is affirmed.

All concur.