**In the Matter of the Care and Treatment of Richard BERG.**

**Richard Berg, Appellant,**

v.

**State of Missouri, Respondent.**

**No. SD 30492.**

Missouri Court of Appeals, Southern District, Division One.

June 10, 2011.

---

1. All rule references are to Mo. R.Crim. P.2009, unless otherwise indicated.

Erika Eliason, Columbia, MO, for Appellant.

Chris Koster, Atty. Gen. and Jayne T. Woods, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

Richard Berg ("Appellant") appeals the judgment of the Probate Division of the Greene County Circuit Court ("the probate court") committing him to secure confinement in the custody of the Department of Mental Health ("DMH") as a sexually violent predator ("SVP"). *See* § 632.480, *et seq.*[1] Appellant now asserts five points of probate court error. The judgment of the probate court is affirmed.

On February 16, 2005, the State of Missouri filed a "Petition" against Appellant to have him civilly committed due to his prior conviction for the "sexually violent offense" of "sexual abuse" of a child.[2] A jury trial was held on November 19, 2009, before the probate court. Viewing the evidence in the light most favorable to the jury's verdict and disregarding all contrary evidence, *In re A.B.*, 334 S.W.3d 746, 752 (Mo.App.2011), the record reveals that Appellant was the product of a chaotic childhood and an inconsistent and disruptive home environment; that he had a criminal record as a juvenile and spent time in juvenile detention as well as in an adolescent treatment facility; that he was sexually abused as a young child and then as

an adolescent when he became involved in "a very intense sexual relationship" with his adult male martial arts instructor; that Appellant did not view himself as a "victim" of sexual abuse, but, instead, viewed the experiences as "positive and growth enhancing;" and that Appellant's "sexually violent abuse history goes back at least to 1987" and continued through his conviction in 1999 for the sexual abuse of C.A., for which he received a sentence of five years imprisonment. Further, there was testimony that Appellant had multiple adolescent male victims over a period of years whom he befriended by introducing them to martial arts or to American Indian culture. Using this profile, Appellant would "groom and manipulate [his victims] into a variety of sexual compromises and sexual abusive behaviors." There was also evidence that Appellant would supply drugs and alcohol to his victims in order to reduce their inhibitions.

Dr. Barry Leavitt ("Dr. Leavitt"), a clinical and forensic psychologist, testified on behalf of the State that he interviewed one of Appellant's victims, M.P., in the course of preparing a psychological evaluation of Appellant. He testified that M.P. told him that Appellant began abusing him when he was twelve years old under the guise of teaching him martial arts and that the abuse progressed from fondling to oral sex and eventually to anal penetration. M.P. recounted to Dr. Leavitt

1. Unless otherwise stated, all statutory references are to RSMo 2000.

2. We note as an aside that there is no *ex post facto* issue in this case. While the petition for commitment in this matter was filed on February 16, 2005, and the changes to the burden of proof found in section 632.495.1, RSMo Cum.Supp.2006, were made effective on June 5, 2006, it has been held that changes in a statute's burden of proof "are procedural and apply prospectively only" such that any procedural changes will apply in "all cases in which trial begins after ..." the effective date of the changes in the statute. *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996); *see also Storey v. State*, 175 S.W.3d 116, 132 (Mo. banc 2005). Appellant's trial was held well after the effective date of the 2006 amendments to the SVP statutes.

that Appellant became physically violent toward him such that he was frightened of Appellant. According to M.P., as he got older Appellant seemed to lose interest in him and moved on to younger victims. Dr. Leavitt testified that in addition to interviewing M.P., he also reviewed all of the records provided to him by the Department of Corrections including Appellant's treatment history, psychological evaluations, investigative reports, and criminal records. In his review of Appellant's case, he noted the similarities in the abuse perpetrated on Appellant when he was a youth and the abuse he was engaging in with underage boys. He also noted that Appellant remained an untreated sexual offender as he had failed to complete any of the sexual offender treatment programs offered to him while he was incarcerated, and he continued to have a difficult time understanding the concept of the sexual abuse of a child.[3] Dr. Leavitt testified that in conducting his risk assessment of Appellant he employed, in part, actuarial instruments in his evaluation including the Static–99, the MnSost–R and the PCL–R. *See Murrell v. State*, 215 S.W.3d 96, 108–09 (Mo. banc 2007). He diagnosed Appellant with "paraphilia not otherwise specified" or what he would call "hebephilia," which is "similar to a diagnosis of pedophilia but ... talking about ... individuals that have a hebephilic orientation, interested not in young children as pedophiles would be, but are primarily interested, in his case, in young adolescent males." He also diagnosed Appellant with antisocial personality disorder and substance abuse issues. Dr. Leavitt concluded that Appellant "did meet the criteria as

a[n SVP] under the Missouri statute" and in his opinion Appellant "possessed the mental disorders which predisposed him to sexually violent or predatory behavior...." It was Dr. Leavitt's opinion that Appellant would "more likely than not" commit future "acts of sexual violent behavior if not confined to a secured care treatment setting."

Dr. Leavitt also recounted to the jury Appellant's sexual abuse of C.A. for which he was convicted in 1999. Dr. Leavitt revealed that C.A. met Appellant at a sleep over at "the Indian Center" in 1996. On that first occasion Appellant plied C.A. with marijuana and then sexually assaulted C.A. when he was attempting to sleep. According to C.A., Appellant abused him five to ten times by fondling his genitals, engaging in oral sex with him and anally penetrating him. C.A. related that as time passed Appellant became more physically aggressive with him as well as more threatening.

Additionally, portions of the deposition testimony of R.M., another of Appellant's alleged victims, was read into the evidence by the State. R.M. testified that when he was twelve or thirteen years old he and his friends became acquainted with Appellant when Appellant offered to teach them martial arts and help them "learn the Native American path." R.M. related that Appellant regularly touched the boys in an "uncomfortable manner" by cupping their genitals when they stretched prior to doing martial arts. He stated that he began attending Native American events with Appellant and within a few months Appellant's abuse progressed from fondling to

---

**3.** Following Appellant's conviction and incarceration for abusing C.A., he briefly participated in the Missouri Sex Offender Program ("MOSOP"). Appellant initially failed to complete Phase I of MOSOP, but completed it on his second try. He was then terminated from Phase II of the program for failing to make meaningful progress toward his treatment and because the providers felt that he was "being deceitful and dishonest." Ultimately, he never completed MOSOP.

anal penetration. R.M. stated he was afraid of Appellant because Appellant always had weapons readily available; during one encounter Appellant threatened R.M. with a gun; and Appellant had threatened to kill R.M. and his family on another occasion. R.M. related that he had witnessed Appellant being physically violent toward M.P. He further related that Appellant introduced him to alcohol and a variety of illegal drugs such as marijuana, acid and mushrooms. R.M. recounted the abuse continued until he was fifteen or sixteen years old when he committed a burglary in order to be incarcerated and escape from Appellant's abuse.

Just prior to Appellant's release from prison, Dr. David Suire ("Dr. Suire"), the MOSOP Clinical Director, filed his "END OF CONFINEMENT REPORT" which diagnosed Appellant with "Pedophilia, Nonexclusive Type, Sexually Attracted to Males;" "Paraphilia, [not otherwise specified], Underage Males;" and "Antisocial Personality Disorder (Severe with Psychopathy)." Dr. Suire found that "[a]ctuarial data indicates a medium-low risk that he will commit future acts of sexual violence. Records suggest at least one and perhaps more uncharged victims of sexual violence. He has not completed treatment aimed at reducing his risk of sexual violence." Pointing to, among other things, Appellant's "specific deviant sexual attraction to late prepubescent and early pubescent boys," his "extremely high degree of antisocial thinking and behavior," and the likelihood that Appellant is a "[p]sychopath," Dr. Suire concluded that Appellant "has a mental abnormality that makes him more likely than not to commit future acts of predatory sexual violence." As a result, Dr. Suire opined that Appellant met "the definition of a[n SVP] as defined in [section] 632.480."

The State also called Appellant to testify; however, Appellant invoked his Fifth Amendment right not to testify and only answered a handful of general questions.

Dr. Steven Jackson ("Dr. Jackson"), a psychologist with the DMH, testified on behalf of Appellant that he conducted a "SEXUALLY VIOLENT PREDATOR EVALUATION" on Appellant at the request of the State. After meeting with Appellant, reviewing his history, and examining his records, Dr. Jackson compiled his written report which included the following information: Appellant had a history of physical and sexual abuse at the hands of caregivers beginning at a young age; he had a history of juvenile criminal issues which resulted in his placement in a juvenile facility on more than one occasion; he had a history of abusing alcohol and a variety of illegal drugs; his sexual history began at the age of thirteen when he became involved with a seventeen-year-old girl and a child was produced from that union; he engaged in a sexual relationship with his adult male martial arts instructor beginning at the age of sixteen; he reported being in a sexual "love relationship that lasted for approximately four years" with a fourteen-year-old male victim; and he reported "he groomed both th[is] victim and the victim's mother so that he could spend time alone with the victim." After performing the Static–99, the MnSost–R, and utilizing an adjusted actuarial approach relating to Appellant, Dr. Jackson diagnosed Appellant with "Paraphilia Not Otherwise Specified," but determined Appellant "does NOT suffer from a mental abnormality which makes him more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility."

James LaBundy ("Mr. LaBundy"), the Director for the Missouri Department of Corrections at the time of Appellant's incarceration, testified for Appellant that at

the conclusion of an inmate's sentence there is a "Multidisciplinary Team" that reviews cases of possible civil commitment and gives an opinion on whether a case should proceed. He related that in Appellant's case the multidisciplinary team concluded that Appellant did not "appear to meet the definition of [an SVP]." He stated this information was then passed on to the attorney general which concluded, nevertheless, that it wanted to file a petition in this matter.

At the conclusion of all the evidence, the jury unanimously determined Appellant to be an SVP; the probate court entered a judgment finding him to be an SVP; and he was then civilly committed to the custody of the DMH by the probate court. This appeal followed.

■■■ The burden of proof in civil commitment proceedings is clear and convincing evidence. *In the Matter of the Care and Treatment of Van Orden*, 271 S.W.3d 579, 586 (Mo. banc 2008). In an SVP case, our review is limited to a determination of whether there was sufficient evidence admitted from which a reasonable factfinder "could have found each necessary element by clear and convincing evidence." *In re A.B.*, 334 S.W.3d at 752. This Court does "not reweigh the evidence. We determine only whether the judgment was supported by sufficient evidence. Matters of credibility and weight of testimony are for the factfinder to determine." *Care and Treatment of Barlow v. State*, 250 S.W.3d 725, 733 (Mo.App.2008) (internal citation omitted). As previously related, "the evidence

is viewed in the light most favorable to the judgment, accepting as true all evidence and reasonable inferences favorable to the judgment and disregarding all contrary evidence and inferences." *In re A.B.*, 334 S.W.3d at 752. "A judgment will be reversed on insufficiency of the evidence only if there is a complete absence of probative facts supporting the judgment." *Id.*

"Under Missouri's [SVP] Civil Commitment Act, a[n SVP] is defined at section 632.480(5) as 'any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility.'" *Bemboom v. State*, 326 S.W.3d 857, 860 (Mo.App. 2010) (quoting § 632.480(5)). "A mental abnormality is defined at section 632.480(2), as 'a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.'" *Id.* (quoting § 632.480(2)).

The Supreme Court of Missouri has held "that in instructing a jury [in an SVP case], mental abnormality must be defined as 'a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his behavior.'" [4] *Id.* (quoting *In re Care & Treatment of Thomas v.*

---

4. As explained in *Bemboom*, 326 S.W.3d at 860,

> [t]he requirement that mental abnormalities cause an offender serious difficulty controlling his behavior was engrafted into the definition of mental abnormality in response to the United States Supreme Court's decisions in *Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d

856 (2002), and *Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), which combine to hold that [SVP] statutes are constitutional so long as the definition of mental abnormality distinguishes [SVPs] from other dangerous persons more properly dealt with via traditional criminal proceedings.

*State,* 74 S.W.3d 789, 792 (Mo. banc 2002)) (emphasis omitted). As set out in *Thomas,* 74 S.W.3d at 791 n. 1, "[t]he section 632.480(2) definition of 'mental abnormality' specifically speaks of the 'degree' of the emotional or volitional condition suffered by the offender. The Supreme Court's requirement of 'serious difficulty' is a refinement of this term, not the addition of a new element." *Id.*

■ In his first point relied on Appellant maintains the probate court erred "in committing [Appellant] to indefinite secure confinement in the custody of the [DMH] as a[n SVP] . . ." because the State failed to prove by clear and convincing evidence that Appellant "met the definition of a[n SVP]. . . ." Appellant asserts the evidence "established a diagnosis of paraphilia, a mental abnormality, but not that he had serious difficulty controlling his behavior and was more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility."

Appellant attacks the sufficiency of the evidence presented at trial on the basis that the State did not "provide any evidence that [Appellant's mental abnormality made him] unable to control his behavior." Based on the record before this Court, we believe there was clear and convincing evidence presented that Appellant suffered from a mental abnormality such that he had serious difficulty controlling his behavior and that he would more likely than not commit further acts of sexual violence if not confined in a secure facility. We reach this conclusion for two reasons.

■ First, while "the State must demonstrate by clear and convincing evidence that an offender has a mental abnormality causing the offender serious difficulty controlling his behavior, the State is not required to prove that the offender has an absolute inability to control his behavior," *Bemboom,* 326 S.W.3d at 860, nor is there

a requirement that the State prove a " 'total or complete lack of control.' " *Id.* (quoting *Kansas,* 534 U.S. at 411, 122 S.Ct. 867). Accordingly, the State cannot be faulted for failing to introduce evidence it was not required to introduce.

Second, the evidence presented clearly supported the proposition that Appellant suffered from a mental abnormality that caused him serious difficulty in controlling his behavior. Dr. Leavitt testified that Appellant suffered from paraphilia and antisocial personality disorder such that "his sexual deviance was tied to his personality and to his life functioning, a fixated pervasive type of sex offender." Both antisocial personality disorder and paraphilia have qualified as mental abnormalities under the SVP statute "if . . . linked to past sexually violent behavior." *Murrell,* 215 S.W.3d at 108; *Dunivan v. State,* 247 S.W.3d 77, 78 (Mo.App.2008). Further, Dr. Leavitt testified Appellant was unsuccessful in completing his sexual offender treatment and opined that Appellant still had not come to terms with his own sexual abuse suffered when he was a child. According to Dr. Leavitt, Appellant clearly had not taken any steps to understand or better control his sexual deviances. Appellant admitted he had sexually abused a number of young boys with the abuse typically lasting a period of years. He reportedly even abused some of the boys in the presence of five or six other juveniles. It can be inferred that Appellant knew his actions were wrong as he threatened some of his victims into remaining silent so that his sexual deviance would not be exposed. All of the aforementioned evidence illustrated that Appellant had serious difficulty controlling his behavior. The jury was free to believe the testimony offered by the experts and the lay witnesses. *Care and Treatment of Barlow,* 250 S.W.3d at 733.

Further, Dr. Leavitt and Dr. Suire both testified that it was their belief that it was more likely than not that Appellant would re-offend if released from prison due to his mental abnormality and sexual deviances. Again, the "jury was free to believe [such] expert testimony." *Bemboom*, 326 S.W.3d at 864. The State presented sufficient evidence from which a reasonable juror could conclude that clear and convincing evidence established that Appellant suffered from mental abnormalities which caused him to have serious difficulty controlling his behavior and that Appellant was an SVP. Point I is denied.

■ In his second point relied on Appellant asserts the probate court erred in overruling his objections "to exclude testimony regarding allegations of child abuse because they were not reasonably reliable pursuant to [s]ection 490.065...." He maintains the probate court erred in permitting Dr. Leavitt to testify that he reviewed R.M.'s deposition in which he "related his own abuse by [Appellant] but then also said there were at least fifty other children that [Appellant] molested, prejudicing [Appellant] since the allegations were unsubstantiated."

■ A probate court's decision to allow evidence at trial is reviewed for abuse of discretion. *Elliott v. State*, 215 S.W.3d 88, 92 (Mo. banc 2007). Abuse of discretion is found only if the probate court's ruling was against the logic of the circumstances and so arbitrary or unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* "Even when this threshold is met, we will not reverse unless the error had a material effect upon the merits of the action." *Care & Treatment of Wadleigh v. State*, 145 S.W.3d 434, 438 (Mo.App.2004).

Here, prior to trial, Appellant filed a motion in limine to preclude the State from introducing evidence that "there were allegations of over 50 other unnamed victims contained within the deposition of R[.M.]." Appellant's counsel orally argued that R.M.'s deposition, which was relied upon by Dr. Leavitt in forming his expert opinion, was not reasonably reliable under section 490.065.[5] The State rebutted this argument by asserting that it was going to introduce R.M.'s deposition testimony, which was subject to cross-examination by Appellant's counsel at the time the deposition was made, in lieu of R.M. testifying live at trial such that there was no proper reason for excluding the evidence based on the fact that Dr. Leavitt may have relied upon it in reaching his expert opinion. Appellant's motion was overruled by the probate court.

During his direct examination at trial, Dr. Leavitt made no mention of R.M.'s deposition testimony, although he mentioned his interview of M.P. and M.P.'s report "that he was aware of multiple other victims. [M.P.] reported ... he knew of four additional victims." Appellant's counsel did not object to this testimony. Then, on cross-examination, Appellant's counsel questioned Dr. Leavitt regarding R.M.'s deposition testimony and his reliance on it:

COUNSEL FOR APPELLANT: And—now when you were talking about [R.M.]

5. Section 490.065.3 provides that:
[t]he facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.
With that being said, it has been held that "experts can rely on evidence not otherwise admissible, as long as it is the type of evidence reasonably relied upon by other experts in the field." *Id.*

you had ... read through his deposition, I believe?

DR. LEAVITT: Yes, I did.

COUNSEL FOR APPELLANT: And you referred to it in your testimony and in your report?

DR. LEAVITT: Yes.

. . . .

COUNSEL FOR APPELLANT: And your report says that he was, quote, personally aware of numerous additional young boys, correct?

DR. LEAVITT: I believe I stated that this is what the deposition stated. He stated in the deposition under sworn testimony.

COUNSEL FOR APPELLANT: But he never gave any—he never gave any names, correct?

DR. LEAVITT: When you say—I thought he did give names. I might have been wrong.

COUNSEL FOR APPELLANT: He never gave any last names. He might have given one or two first names.

DR. LEAVITT: Well, that is a name.

COUNSEL FOR APPELLANT: There were no names that you could follow up on and call that person and verify anything?

DR. LEAVITT: I guess that would be true, but he did give names.

. . .

COUNSEL FOR APPELLANT: In the deposition [R.M.] doesn't give—and this is all you had to go by, correct?

DR. LEAVITT: With respect to his testimony, that's what I had to go by, yes.

COUNSEL FOR APPELLANT: Well—and he claims that he was aware of a huge number of men that were victimized by him when they were young like him?

DR. LEAVITT: I believe he says—he makes reference to there being 50 or more victims.

Later, when R.M.'s deposition testimony was read into the evidence by the State, the portion relating to possible additional victims was excluded.

 Here, the only testimony relating to there being "at least fifty other children that [Appellant] molested ..." was introduced during Appellant's counsel's cross-examination of Dr. Leavitt. This error was invited by Appellant. "The general rule of law is that 'a party may not invite error and then complain on appeal that the error invited was in fact made.'" *Lau v. Pugh*, 299 S.W.3d 740, 757 (Mo. App.2009) (quoting *Rosencrans v. Rosencrans*, 87 S.W.3d 429, 432 (Mo.App.2002)). It is axiomatic that a "party cannot lead a trial court into error and then ..." lodge a complaint about the action. *Schluemer v. Elrod*, 916 S.W.2d 371, 378 (Mo.App.1996). Appellant's point lacks merit. Point II is denied.

 In his third point relied on Appellant maintains the probate court erred in permitting the State to call Appellant to testify "because that violated [his] privilege against self-incrimination in front of the jury...." He asserts this was error because the probate court "was informed by counsel that [Appellant] would be invoking his Fifth Amendment rights and compelling him to invoke those rights before the jury would lead the jury to infer the existence of other offenses."

Here, in its case in chief, the State called Appellant to the witness stand although it had already been informed by Appellant's counsel that Appellant would be invoking his Fifth Amendment right not to incriminate himself. Appellant's counsel objected on the basis that "it would cause unfair prejudice ... when [the State] knows that [Appellant] is not going to testify." The

probate court permitted Appellant to take the stand despite his counsel's objection. On direct examination Appellant answered the State's questions as to his legal name as well as aliases, but he invoked his Fifth Amendment right to decline to answer two questions regarding his own sexual abuse at the hands of his martial arts instructor and his alleged abuse of M.P. He then also invoked his Fifth Amendment right when asked by the State to identify "Exhibit F," which was apparently the handwritten letter from Appellant to M.P.'s mother that had been referenced by the State in its opening statement. After his testimony, his counsel asked for a mistrial, a request which was denied by the probate court.

Section 491.030 sets out that:

[a]ny party to any civil action or proceeding may compel any adverse party, or any person for whose immediate and adverse benefit such action or proceeding is instituted, prosecuted or defended, to testify as a witness in his behalf, in the same manner and subject to the same rules as other witnesses; provided, that the party so called to testify may be examined by the opposite party, under the rules applicable to the cross-examination of witnesses.

Such a party then has the right to assert the privilege against self-incrimination which is "guaranteed by the Fifth Amendment of the United States Constitution and Article I, section 19 of the Missouri Constitution. To avail oneself of the guaranteed right, one must assert the right." *State ex rel. Long v. Askren,* 874 S.W.2d 466, 471 (Mo.App.1994). " 'The prevailing rule is that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.' " *Johnson v.*

*Missouri Bd. of Nursing Adm'rs,* 130 S.W.3d 619, 629 (Mo.App.2004) (quoting *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). " 'In civil cases, a witness' invocation of his privilege against self-incrimination justifies an inference that, if he had answered the question truthfully, the answer would have been unfavorable to him.' " *Cruce v. Auto–Owners Mut. Ins. Co.,* 851 S.W.2d 10, 14 (Mo.App.1993) (quoting *Lappe & Assoc., Inc. v. Palmen,* 811 S.W.2d 468, 471 (Mo.App.1991)). "Whether to permit a witness to testify who claims that he will invoke his right against self-incrimination lies within the sound discretion of the trial court." *Id.* " 'This is a matter which requires the trial court to exercise sound judgment giving due consideration to the facts and circumstances existent at the time the question arises.' " *Id.* (quoting *State v. Loggins,* 698 S.W.2d 915, 918 (Mo.App.1985)).

Acknowledging that the Supreme Court of Missouri has recognized the compelling state interest in calling an alleged SVP to testify on behalf of the State, *In the Matter of the Care and Treatment of Bernat v. State,* 194 S.W.3d 863, 870 (Mo. banc 2006), Appellant, nevertheless, argues the probate court's error here stems from the fact that the State knew beforehand that Appellant was going to invoke his right against self-incrimination and the probate court then permitted Appellant to take the stand to prejudicially invoke his right in front of the jury. Appellant's assertion here fails. While as a general rule it has been held that a "witness cannot be called by either party to testify at a jury trial solely for the purpose of having the witness invoke the Fifth Amendment ...," *State ex rel. Jackson Cty. Pros. Atty. v. Moorhouse,* 70 S.W.3d 552, 557 (Mo. App.2002), a trial court may require a witness to be called where "there is a reason-

able expectation that the witness will provide some legitimate testimony in addition to invoking his privilege against self-incrimination or when there is some question as to whether the witness will invoke this privilege at all...." *State v. Sidebottom*, 753 S.W.2d 915, 922 (Mo. banc 1988). Here, the State admittedly knew that Appellant was likely to invoke his Fifth Amendment right not to incriminate himself if he were called to testify on its behalf; however, the State called Appellant in an attempt to lay the foundation for a letter authored by Appellant to M.P.'s mother that it read to the jury in opening statement. Appellant's testimony, therefore, could have provided legitimate testimony relating to the letter and its authenticity. Further, it is not lost on this Court that Appellant testified under oath at a deposition prior to trial. The giving of deposition testimony by a witness has been found to waive the Fifth Amendment privilege as the deposition testimony could have been substituted as substantive evidence for Appellant's live testimony at trial. *State v. Kinder*, 942 S.W.2d 313, 329 (Mo. banc 1996). Accordingly, here, "it [was] not error for the court to require the witness to claim the privilege against self-incrimination in the presence of the jury." *Sidebottom*, 753 S.W.2d at 922.

■ Additionally, even if the probate court had committed error in allowing the State to call Appellant to testify, Appellant is unable to prove he was prejudiced by the invocation of his Fifth Amendment rights in front of the jury. The record reveals that only one of the three questions posed by the State could have arguably elicited a prejudicial, incriminating answer from Appellant. This question, relating to his possible sexual abuse of M.P., was actually answered in the affirmative by Appellant during his interview with Dr. Jackson and this fact was recounted by Dr.

Jackson to the jury without objection. Additionally, the State made no reference to Appellant's lack of testimony or invocation of his privilege in its argument to the jury. The probate court did not abuse its discretion in overruling Appellant's objection and in allowing the State to call Appellant to testify. Point III is denied.

■ In his fourth point relied on Appellant asserts the probate court abused its discretion in denying Appellant's request to strike venireperson David Webb ("Mr. Webb") from the venire panel. He maintains Mr. Webb

> was disqualified from service on the jury due to his statement that he would not be able to judge which expert was right and so he would base his decision on what [Appellant] had done in the past. His answer was an admission that he would prejudge all experts and would not follow the court's instruction to determine the credibility of witnesses and he should have been struck for cause. Mr. Webb served on the jury that returned a verdict committing [Appellant] to the custody of the [DMH].

During voir dire, counsel for Appellant asked the venire if any of the prospective jurors "would not release [Appellant] on account and only on account of his past criminal actions alone." The following colloquy then occurred between Appellant's counsel and Mr. Webb:

> MR. WEBB: If all things were equal, if their side I felt was pretty much even with your side, his past would definitely weigh on the—make a difference, it would have to. I don't know the man, but I don't like him. I say most people in here don't like him, but that's not what we're here for, but his past would have to weigh—would have to make the difference.
>
> COUNSEL FOR APPELLANT: So his past would make a big difference?

MR. WEBB: Not a big difference maybe, but it would definitely weigh to make the difference if everything was— 'cause I'm not a psychologist. These psychologist[s] come in here, I don't know what they're saying. And so who do I know is right, his psychologist, your psychologist? I went through the 12th grade, but I'm no—so if I thought everything was—if I wasn't for sure his past would definitely make a difference.

COUNSEL FOR APPELLANT: So you're trying to weigh out the situation, okay. You're trying to decide what the probability of [Appellant] reoffending is, his past would play an effect on your decision?

MR. WEBB: Definitely.

COUNSEL FOR APPELLANT: Would he—

MR. WEBB: I'm not saying that it would make the overall difference. If your psychologist I thought made a lot more sense than theirs, then that's what I would have to go by. But if I wasn't certain which one was right, you know, or which one of you was in the best case, it would have to make a difference. I couldn't help but let it make a difference.

COUNSEL FOR APPELLANT: So in a close call you think the past would prejudice you against him?

MR. WEBB: It definitely would.

COUNSEL FOR APPELLANT: To the degree that you—how big a degree? How much?

MR. WEBB: Well, it would make a difference in my decision whether I voted for them or for him.

COUNSEL FOR APPELLANT: So his past would be a deciding factor?

MR. WEBB: (No audible response.)

Appellant's counsel later moved to strike Mr. Webb for cause because Mr. Webb did not "think that he can judge which psychiatrist is right. So he said he wasn't sure, then the past would make the difference. He would vote, you know, for the State basically." This request was overruled by the probate court and Mr. Webb sat on Appellant's petit jury.

 "The right to unbiased and unprejudiced jurors is foundational to the judicial process." *Speck v. Abell–Howe Co.,* 839 S.W.2d 623, 626 (Mo.App.1992). " 'It is fundamental that jurors should be thoroughly impartial as between the parties. The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the Constitution.' " *Id.* (quoting *Kendall v. Prudential Ins. Co. of America,* 327 S.W.2d 174, 177 (Mo. banc 1959)). Section 494.470.2 establishes the grounds for challenging a potential juror for cause and states that "[p]ersons whose opinions or beliefs preclude them from following the law as declared by the court in its instructions are ineligible to serve as jurors on that case." As explained in *Joy v. Morrison,* 254 S.W.3d 885, 891 (Mo. banc 2008), "[t]he critical question in these situations is always whether the challenged venireperson indicated unequivocally his or her ability to fairly and impartially evaluate the evidence ..." and "it is proper for the trial court to consider the juror's testimony concerning his or her ability to act impartially." *See Ray v. Gream,* 860 S.W.2d 325, 334 (Mo. banc 1993). "Initial reservations expressed by venirepersons do not determine their qualifications; consideration of the entire voir dire examination of the venireperson is determinative." *Joy,* 254 S.W.3d at 891. As such, "[i]f the trial court is convinced that a juror can be fair and impartial after consideration of the entire voir dire examination, then the court is not required to disqualify a juror merely because a certain response, when considered alone, raises the bare possibility of prejudice." *Andersen v. Osmon,* 217 S.W.3d 375, 379 (Mo. App.2007).

The Supreme Court of Missouri has reiterated the standard of review for a trial court's denial of a request to strike a venireperson for cause:

[a] trial court's ruling on a challenge for cause will be upheld on appeal unless it is clearly against the evidence and is a clear abuse of discretion. The relevant question is whether a venireperson's beliefs preclude following the court's instructions so as to prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. A venireperson's qualifications as a prospective juror are not determined by an answer to a single question, but by the entire examination. The trial court is in the best position to evaluate a venireperson's qualifications to serve as a juror and has broad discretion in making the evaluation.

*Joy*, 254 S.W.3d at 888 (internal citations and quotations omitted).

Here, it is our view that Mr. Webb's responses during voir dire did not indicate bias or an inability to follow the directions of the probate court as urged by Appellant. Instead, Mr. Webb's responses show that he would weigh the credibility of the experts for both parties and, if he was unable to reach a conclusion after such an examination, he would then consider Appellant's past behavior as a factor in reaching his decision. Further, it is axiomatic that in an SVP determination the offender's past plays a legitimate role in the jury's determination as to whether or not the offender has "pled guilty or been found guilty by reason of a mental disease or defect . . . of a sexually violent offense . . ." and suffers from "a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility." § 632.480(5). In fact, the majority of the evidence offered by the experts and other witnesses in this matter was related to Appellant's past behaviors of sexual deviance. There is no error in a juror considering an offender's past behavior such that there was no bias shown in Mr. Webb's responses during voir dire. The probate court, being in a better position to evaluate the responses, found Mr. Webb's testimony to be an unequivocal indication that he could evaluate the evidence fairly and impartially. The probate court did not abuse its discretion in denying Appellant's request to strike Mr. Webb for cause. Point IV is denied.

■■■ In his fifth point relied on Appellant maintains the probate court erred in overruling his "motion to use the criminal verdict form . . . ." He asserts his constitutional rights were violated by the verdict form in this case which required "all jurors to sign the verdict" because such a form "caused a chilling effect by requiring a public record to be made of every juror's name which might have subjected them to harassment if they had found that [Appellant] was not a[n SVP]."

Here, the following instruction was given to the jury: "[t]he verdict form included in these instructions contains directions for completion and will allow you to return the permissible verdict in this case. Your verdict must be agreed to by each juror. The verdict must be unanimous and must be signed by each juror." The verdict form itself then included the instruction that the jury was to "[c]omplete this form by filling in the word or words required by your verdict;" a line stating "[w]e, the jury find that [Appellant] _____ (here insert either 'is' or 'is not') a[n SVP];" and twelve blank lines for the signature of each juror. Appellant objected to the verdict form at the instruction conference as well as in his motion for new trial.

■■■ " "The use of verdict forms published in the ["Missouri Approved In-

structions" ("MAI") ] is mandatory in any case the verdict form applies.'" *Pickel v. Gaskin,* 202 S.W.3d 630, 635 (Mo.App. 2006) (quoting *Nagy v. Missouri Hwy. and Transp. Comm'n,* 829 S.W.2d 648, 653 (Mo.App.1992)). "However, in the absence of an MAI-approved verdict form, the trial court must provide a form which 'fairly and accurately meets the situation of the case on trial.'" *Id.* (quoting *Dunkin v. Reagon,* 710 S.W.2d 498, 501 (Mo.App. 1986)). As "the trial court is in the best position to evaluate the effect of the verdict form, we will not disturb the decision of the trial court absent an abuse of discretion." [6] *Id.*

With that being said, "[t]here are ... no applicable MAI instructions [or verdict forms] for SVP cases." *In re Ginnery,* 295 S.W.3d 871, 873 (Mo.App.2009). Accordingly, the structure of the verdict form in the present case was within the ambit of discretion accorded to the probate court. As described above, the issue with the verdict form here was the requirement that each juror sign the form on the twelve blank lines provided. The State urges that this form was simply a modification of civil verdict form MAI 36.18, the verdict form for "Commitment for Mental Illness." This form not only contains twelve lines for jury signatures, but also contains the following instructions: "[n]ote: Complete this form by filling in the word or words required by your verdict;" "[w]e the under-

signed jurors, find: That Respondent ＿＿＿＿＿ (here insert either 'should' or 'should not') be detained for treatment;" and "[n]ote: All jurors who agree to the above finding must sign below." MAI 36.18. This is remarkably similar to the verdict form provided to Appellant's jury. While respondents in SVP cases enjoy many of the protections afforded to criminal defendants, *see In re Salcedo,* 34 S.W.3d 862, 867 (Mo.App.2001), *superceded by statute on other grounds by Care and Treatment of Barlow,* 250 S.W.3d at 731, Appellant has failed to cite this Court to any cases which require that the structure of the verdict form should be equivalent to a verdict form used in criminal proceedings.[7] This Court further notes that the case law on challenging verdict forms has historically been limited to contentions that the verdict form "misdirected, misled or confused the jury." *Pickel,* 202 S.W.3d at 635. It is our view that the verdict form at issue did not suffer from the foregoing defects. The trial court did not abuse its discretion in utilizing the verdict form in the present case. Point denied.

The judgment of the probate court is affirmed.

LYNCH, and BURRELL, JJ., Concurs.

---

**6.** As an aside we note that the trial court's " 'responsibility is much less when dealing with verdict forms as opposed to jury instructions. The form of the verdict is not an instruction, and it is the latter which is to guide the jury in reaching the proper verdict.'" *Lewis v. State,* 152 S.W.3d 325, 328 (Mo.App.2004) (quoting *Lindsey Masonry Co. v. Jenkins & Assocs.,* 897 S.W.2d 6, 12 (Mo. App.1995)).

**7.** We are not persuaded by the language from *In the Matter of the Care and Treatment of Norton,* 123 S.W.3d 170, 177 (Mo. banc

2004), cited by Appellant in support of his proposition that jurors would have "fear" upon discovering they would have to sign a verdict form such that there would be a chilling effect on their decision. The statements cited by Appellant from the concurring opinion in *Norton* were taken out of context from the issues raised in that case, none of which are germane here, and, further, are clearly *dicta* that does not bind this Court. *See Swisher v. Swisher,* 124 S.W.3d 477, 482 (Mo. App.2003).